ALEX HIGHT by Next Friend, Respondent v.
AMERICAN BAKERY COMPANY, Appellant.

St. Louis Court of Appeals. Submitted on Briefs November 11, 1912.
Opinion Filed December 3, 1912.

1. **APELLATE PRACTICE: Binding Effect of Theory at Trial:
Negligence: Pleading.** Where the petition, in an action for
personal injuries, is constructed on the "turntable doctrine"
of negligence and the case is submitted to the jury on that
theory, plaintiff is bound by that theory on appeal.

2. **NEGLIGENCE: "Turntable Doctrine:" Essential Elements.** In
order that an action for injuries to a child may be maintained
under the "turntable doctrine" of negligence, it is necessary
that the machinery or appliance, the operation of which was
the direct cause of the injury, be dangerous in itself, when set
in motion, or be of a kind liable to become dangerous from the
position or condition in which it is left, if set in motion, and
defendant must be guilty of negligence in leaving such ma-
chinery or appliance unguarded, unsecured or unattended, in
an open place frequented by children, so as to allow of its being
put in motion by them.

3. ——: ——: **Applies Only to Children.** The "turntable doc-
trine" of negligence is applied only in those cases in which
the person injured is a child of tender years—on the border-
land, as to age, between the irresponsibility of childhood and
the responsibility of mature years.

4. ——: ——: **Applicable Only to Defeat Contributory Neg-
ligence.** The negligence of the defendant lies at the very
foundation of liability under the "turntable doctrine," and un-
less that is proved, the doctrine may not be invoked; and,
indeed, it is to be invoked only to meet the defense of contrib-
utory negligence on the part of the plaintiff, and not as the
foundation of liability on the part of the defendant.

5. ——: ——: ——: **Difference Between Negligence and
Actionable Negligence.** While the act of suffering a dangerous
appliance, which, in itself or in its position, is a menace to
children, to remain unguarded, is an act of deliberate care-
lessness, it does not necessarily follow that an action will
lie for injuries sustained therefrom, since negligence and action-
able negligence are distinguishable terms, and carelessness
does not always involve liability, but before liability attaches,
a duty on the part of the party charged toward the party in-
jured must arise.

6. **PLEADING: Defective Petition: Aider by Verdict.** Where defendant pleads over after his demurrer to the petition is overruled and a verdict is returned and a judgment is rendered for plaintiff, the fact that the petition states the cause of action counted on in an imperfect manner is not a ground for setting aside the verdict or arresting the judgment.

7. **NEGLIGENCE: Child Injured by Wagon: "Turntable Doctrine:" Sufficiency of Evidence: Burden of Proof.** Defendant's servants, for the purpose of advertising its products, threw into the air from one of its wagons in their charge, which was being driven along slowly, certain whirligig toys. Plaintiff, a boy ten years old, and other children followed the wagon, endeavoring to procure the toys when they fell to the ground. One of the toys fell under the slowly moving wagon, and plaintiff reached between the wheels for it, and one of the rear wheels passed over his arm, causing the injury complained of. Plaintiff brought suit under the "turntable doctrine" of negligence, and his petition, among other things, alleged that it was the purpose of defendant, in causing said wagon to pass along the street and in causing the whirligigs to be thrown into the air, to attract the attention of children thereto. *Held*, that this averment was not sustained by the evidence; *held, further*, that the burden of proving this averment rested on plaintiff.

8. ——: ——: ——. Where the purpose of a person sending up advertising toys from a wagon is to attract children and cause them to congregate around the wagon for the purpose of increasing his business, he owes the children who so congregate a very different duty from that which he owes a child who gets in the way of the wagon through his own impulse and without the knowledge or consent of such person.

9. ——: ——: ——: **Sufficiency of Evidence: Contributory Negligence: Facts Stated.** Defendant's servants, for the purpose of advertising its products, threw into the air from one of its wagons in their charge, which was being driven along slowly, certain whirligig toys. Plaintiff, a boy ten years old, and other children followed the wagon, endeavoring to procure the toys when they fell to the ground. One of the toys fell under the slowly moving wagon, and plaintiff reached between the wheels for it, and one of the rear wheels passed over his arm, causing the injury complained of, for which he brought suit under the "turntable doctrine" of negligence. *Held*, that, although the toys were attractive to children, the act of throwing them from the wagon or the failure of defendant's agents to watch their flight was not actionable negligence, and there being no proof that the wagon was driven negligently, or that defendant's servants had knowledge of

plaintiff's dangerous position, and plaintiff never having been in front of the team, defendant's servants were not guilty of negligence in failing to look behind to see that he did not get under the rear wheels; and hence it is *held* that defendant was not guilty of actionable negligence and, therefore, plaintiff was not entitled to recover. *Held, further*, that plaintiff was guilty of contributory negligence in placing his arm between the wheels of the moving wagon, and that the "turntable doctrine" was inapplicable and could not be employed to relieve him of his contributory negligence.

10. ——: **Driving Wagon: Duty of Driver.** It is the duty of the driver of a wagon to look ahead, in the direction in which he is going, and he is not guilty of actionable negligence in failing to look behind to see what happens after the wagon has passed.

11. ——: **Child Injured by Wagon: "Turntable Doctrine:" Contributory Negligence.** Where a ten-year-old boy placed his arm between the wheels of a moving wagon to seize a toy which had fallen under the wagon, knowing that, if the wagon did not stop and he did not get his arm out in time, the wheel would pass over and injure it, and he was so injured, he was guilty of contributory negligence as a matter of law.

12. ——: ——: ——: **Proximate Cause.** Where, in order that he might seize a toy which had been thrown from a slowly moving wagon and which had fallen under the wagon, a ten-year-old boy placed his arm between the wheels, and one of the rear wheels caught and injured it, his act in placing his arm between the wheels, and not the attractiveness of the toy, was the proximate cause of the injury.

Appeal from St. Louis City Circuit Court.—*Hon. Hugo Muench*, Judge.

REVERSED.

*Merritt U. Hayden* and *H. H. Scott* for appellant.

(1) The law of the "turntable cases" or, as it is frequently called, the "attractive nuisance" doctrine cannot, properly, be applied to the facts of this case, to determine the liability of appellant, for the following reasons: (a) The record does not disclose any negligence on the part of the appellant with re-

spect to the maintenance or manipulation of the alleged attractive device. This doctrine is one which affects only the question of contributory negligence. It cannot be relied on to establish the negligence of the defendant, in any case, to which it is applicable. There is no phase of the "attractive nuisance" doctrine which operates to relieve the plaintiff in such a case of the burden of proving the negligence of the defendant, just as in other cases. Lynch v. Nurdin, 1 Ad. & El. (N. S.) 29; Bottum's Admr. v. Hawks, 79 Atl. 858; Friedman v. Snare & Triest Co., 71 N. J. Law 605; Birge v. Gardiner, 19 Conn. 507; Dailey v. Railroad, 26 Conn. 591; Curley v. Railroad, 98 Mo. 13; Kay v. Railroad, 65 Pa. St. 276; Porter v. Brewing Ass'n, 24 Mo. App. 1; Brewing Ass'n v. Talbot, 140 Mo. 674; Hall v. Telephone Co., 141 Mo. App. 183; Kelly v. Benas, 217 Mo. 1; Witte v. Stifel, 126 Mo. 295. (b) The alleged attractive device, the whirligig, was not, in and of itself, dangerous: Inherently, it was neither a dangerous object nor a dangerous attraction. Rushenberg v. Railroad, 109 Mo. 112; Smith v. Packing Co., 82 Mo. App. 9; Houck v. Railway, 116 Mo. App. 559; Fitzgerald v. Rodgers, 68 N. Y. Supp. 946; Compton v. Railway, 147 Mo. App. 126; Barney v. Railroad, 126 Mo. 372; Water & Light Co. v. Webb, 129 Kentucky, 395; Thompson v. Telephone Co., 127 S. W. 531; (c) The whirligig was not only not inherently dangerous, but, on the occasion of this accident, it was not so manipulated by appellant's employees as to allure, or entice, respondent into a place of hidden danger. Keffe v. Railway, 21 Minn. 207; Berry v. Railroad, 214 Mo. 593; Kelly v. Benas, 217 Mo. 1; Cases cited under subdivision (b). (d) Appellant's employees were not bound to anticipate, when they threw out the whirligig, either that the wind, in spite of their manipulation of the whirligig, would carry it under the wagon, or that respondent would drop down beside the wagon and reach under and immediately in front of the approach-

ing rear wheel in his effort to get it. Kay v. Railway, 65 Pa. St. 276; Porter Brewing Assn., 24 Mo. App. 1; American Brewing Ass'n v. Talbot, 140 Mo. 674; Keffe v. Railway, 21 Minn. 207; Saxon v. Transfer Co., 155 Mo. App. 693; Hall v. Telephone Co., 141 Mo. App. 183; Strode v. Box Co., 124 Mo. App. 511; Wilkerson v. Railroad, 140 Mo. App. 306. (e) There was nothing connected, either with the whirligig itself or with its maintenance or manipulation by appellant, or its employees, embracing the "element of nuisance." Compton v. Railway, 147 Mo. App. 126; Rushenberg v. Railway 109 Mo. 112; Barney v. Railroad, 126 Mo. 372; Curley v. Railroad, 98 Mo. 13; Cases cited under subdivisions (a) and (b). (f) The doctrine of the "turntable cases," repudiated by the courts of many states, and declared of doubtful soundness by those of others, will not be extended by the courts of this State to cover cases not "coming strictly within the limits of the doctrine and presenting every earmarking element upon which liability is predicated" in those cases to which it is applied. Kelly v. Benas, 217 Mo. 1; Curley v. Raliway, 98 Mo. 13; O'Hara v. Gas Light Co., 148 S. W. 884; Barney v. Railroad, 126 Mo. 372; Houck v. Railway, 116 Mo. App. 559; Kaumeier v. Railway, 116 Mich. 306; Marcheck v. Klute, 133 Mo. App. 280; Middleton v. Reuter, 141 App. Div. (N. Y.) 517; Thompson v. Telephone Co., 138 Ky. 109; Stendal v. Boyd, 73 Minn. 53; Stone Co. v. Pugh, 115 Tenn. 688; Harris v. Cowles, 38 Wash. 331; Bottum's Admr. v. Hawks, 79 Atl. 858. (2) Even if this were a case for the application of the doctrine, appellant is still not liable for the reason that the undisputed testimony discloses that the proximate cause of this respondent's injury was not the influence of the alleged attractive object, operating to prevent him from exercising care for his safety, but the determination on his part to defeat the other boys in the enterprise of getting this whirligig. The conduct of respondent, in view of his

age, intelligence, capacity and experience, amounted to contributory negligence, as a matter of 'law, and should have been so declared by the trial court. Twist v. Railroad, 39 Minn. 170; Bishop v. Railroad, 14 R. I. 314; Herdt v. Koenig, 137 Mo. App. 589; Spillane v. Railway, 135 Mo. 414; Payne v. Railway, 136 Mo. 562; Graney v. Railway, 157 Mo. 662; Walker v. Railroad, 193 Mo. 453; McGee v. Railroad, 214 Mo. 530; Mann v. Railroad, 123 Mo. App. 486; Seymour v. Stock Yards Co., 234 Ill. 579. (3) Appellant's employees were not negligent in driving on after respondent assumed the position of peril described by him. There is no testimony in the record tending to show that they either saw, or, by the exercise of ordinary care, would have seen, respondent in time to have averted this accident. The facts of this case do not bring it within the application of either the humanitarian or the last chance doctrine. Stuart v. Street Railway, 210 Mass. 240; Rice v. House Moving Co., 17 App. Div. (N. Y.) 462; Hebard v. Mabie, 98 Ill. App. 543; Curley v. Railway, 98 Mo. 13; McGee v. Railway, 214 Mo. 530; Nivert v. Railway, 232 Mo. 626.

*Senaca N. Taylor* for respondent.

(1) Negligence is the failure to observe, for the protection of the interests of another person, that degree of care, precaution and vigilance which the circumstances justly demand, whereby such person suffers injury. Feeny v. Railroad, 123 Mo. App. 420; O'Hara v. Gas L. Co., 131 Mo. App. 428; Gallagher v. City of Tipton, 133 Mo. App. 557; Liene v. Cont Co., 134 Mo. App. 562; Combs v. Kirksville, 134 Mo. App. 649; Hillerbrand v. Merc. Co., 141 Mo. App. 122; Booker v. Railroad, 144 Mo. App. 282; Compton v. Railroad, 147 Mo. App. 414; Nagel v. Railway, 75 Mo. 659; Schmidt v. Dist. Co., 90 Mo. 294; Wenker v. Railway, 169 Mo. 592; Berry v. Railroad, 214 Mo. 594;

Glaser v. Rothschild, 221 Mo. 181. In the case at bar plaintiff was not ten years old when injured. Defendant's employees having charge of the wagon, saw him and other boys playing upon the street, and in throwing up these whirligigs, knew that they would attract and entice these little boys in an effort to obtain them. The sole object of winding up these toys and throwing them in the air was to awaken the curiosity, attract, excite and cause the boys to struggle to get them, and so advertise defendant's bread and increase its sale. Defendant's employees knew that boys of tender years were heedless of environment and that their eagerness to get one of these attractive toys would make them thoughtless of danger. Undeniably, all this was known to defendant's employees who were driving this decorated wagon over the most populous streets of the city, and winding up these whirligigs and throwing them from the wagon into the air. It was the duty, therefore, of the defendant's employees, if they desired to advertise bread, by such means, to have stopped the wagon until the whirligigs thrown in the air had been gotten by the boys, and to see that no child would be injured in their eager attempt to get one of these toys, while the wagon was in motion. This they failed to do and such failure was negligence directly causing plaintiff's injuries. From the undisputed evidence under the authorities above cited, it was the duty of the trial court to submit to the jury the question of defendant's negligence. (2) Where a boy uses the care reasonably to be expected from one of his years and capacity, he is not guilty of contributory negligence, and whether or not he did use such care is a question for the jury. Donaho v. Iron Works, 7 Mo. App. 450; Rogers v. Meyerson Print. Co., 103 Mo. App. 683; Overmeyer v. Scheer, 120 Mo. App. 70; Winkel v. Peck D. G. Co., 132 Mo. App. 656; Donaho v. Iron Works, 75 Mo. 401; Schmidt v. Dist. Co., 90 Mo. 294; Williams v. Railway, 96 Mo. 275; Dowling

v. Allen, 102 Mo. 213; Schmidt v. Railway, 119 Mo. 256; Van Natty v. Railway, 133 Mo. 13; Railroad v. Gladman, 15 Wal. 401; Railroad v. Straus, 17 Wal. 675; Railroad v. Fitzsimmons, 22 Kan. 686; Hydraulic Co. v. Orr, 38 Pa. St. 322. (3) Before the court can declare as a matter of law that the defendant was not guilty of negligence or that plaintiff was guilty of contributory negligence, the evidence must be such that all fair-minded men will say that defendant was not guilty of negligence as charged, or that plaintiff was guilty of contributory negligence, and not such that reasonable men might differ in respect thereto. Herboth v. Gaal, 47 Mo. 255; Moore v. Transit Co., 95 Mo. App. 728; Combs v. Kirksville, 134 Mo. App. 649; Shamp v. Lambert, 142 Mo. App. 567; Johnson & Co. v. Ice Ref. Co., 143 Mo. App. 442; Wyler v. Ratican, 150 Mo. App. 481; Munro v. Railroad, 155 Mo. App. 711; Lamb v. Railroad, 147 Mo. 171; Murrell v. Smith, 152 Mo. 95; Weller v. Railway, 164 Mo. 181; Erickson v. Railway, 171 Mo. 647; Wilkerson v. Railway, 175 Mo. 161; Eckhardt v. Transit, 190 Mo. 593; Railroad v. Converse, 139 U. S. 469; Railroad v. Ives, 144 U. S. 408; Railroad v. Powers, 149 U. S. 43; Railroad v. Griffiths, 159 U. S. 603; Railway v. Gentry, 163 U. S. 353; Warner v. Railroad, 168 U. S. 34; Railroad v. Landrigan, 191 U. S. 461.

STATEMENT.—Action by an infant for damages alleged to have been sustained by him by reason of a wagon of the defendant, appellant here, running over and injuring his arm, the infant suing by his father as next friend. The action was brought against the American Bakery Company and the Heydt Bakery, alleged to be a branch of the company. After a recital of the minority of plaintiff and the appointment of his father as his next friend, the amended petition upon which the cause was tried avers that plaintiff, then being a minor under the age of ten years, on Saturday

the ninth of July, 1910, was playing with other boys
mostly older than himself, on Dickson street in the
city of St. Louis near his home, and while so playing
the defendants caused a large wagon, similar to a
transfer wagon, to be driven through Dickson street
in the locality where plaintiff was playing, from which
wagon defendants caused to be thrown into the air,
large numbers of toys consisting of whirligigs, on
which defendant advertised certain of the commodities
it had for sale; that said whirligigs were whirled into
the air and would come down in different directions
as they were carried by currents of the air; that it was
the purpose of defendants in causing the large wagon
to pass through Dickson street and causing the whirli-
gigs to be thrown into the air to attract the attention
of children thereto, and that the whirligigs were ex-
ceedingly attractive to children and in this way de-
fendants sought to advertise and did advertise their
commodities; that on the occasion mentioned while
numerous children were attracted to the place where
defendants' employees were driving the wagon and
whirling the whirligigs into the air, many boys were
attracted thereto and struggled with each other to
obtain the whirligigs as they fell through the air to the
street and around and under the heavy wagon; that
plaintiff being a child under ten years of age and not
having the discretion of a larger boy or adult, saw one
of these whirligigs fall under the wagon and rushed
to obtain it, placing his hand and arm under the wagon
to get the whirligig, and defendants' employees who
were driving the wagon then and there carelessly and
negligently caused the hind wheel of the wagon to pass
over plaintiff's right arm, crushing the bone and flesh
above the elbow so as to maim and cripple the plain-
tiff for life. It is further averred that the defendants
and their employees in driving the wagon and throwing
the whirligigs into the air knew or by the exercise of
ordinary care could have known that these toys would

attract plaintiff and other children of immature under-
standing into a place of danger of being injured by the
wagon and cause them to rush to obtain such of the
whirligigs as would fall under the wagon and that in
doing so they were likely to maim or kill such children.
by running over them; "that the act of so driving over
the streets with such heavy wagon, throwing such
whirligigs into the air, as aforesaid, and thereby en-
ticing children to struggle to obtain the whirligigs, and
to place their hands and arms under the wagon to ob-
tain the same, and driving heedlessly, without notic-
ing a child who had put his hand and arm under the
wagon to obtain such whirligig, and passing over and
crushing and breaking his arm, was an act of negli-
gence on the part of defendants." Averring that in
consequence of the injuries plaintiff had suffered great
physical pain and mental anguish and will continue
to suffer the same for many years and that he is in-
jured, crippled and maimed for life and his earning
capacity, after he attains the age of twenty-one years,
will be greatly diminished in consequence of his injury,
plaintiff prays judgment for $7500, with interest and
costs.

The American Bakery Company, in its answer, af-
ter denying each and every allegation in the amended
petition, sets up a plea of contributory negligence on
the part of plaintiff, the contributory negligence al-
leged being that plaintiff had carelessly and negligently
crawled under the wagon and between the front and
rear wheels thereof while the wagon was in motion
and proceeding along the street, and in so doing care-
lessly and negligently allowed his right arm to get
under the rear wheel of the wagon.

A reply denying this was filed.

The trial coming on before the court and a jury,
plaintiff dismissed as to the defendant Heydt Bakery
and thereafter the trial proceeded against the Ameri-
can Bakery Company alone and resulted in a verdict

and judgment in favor of plaintiff and against that defendant in the sum of $600, from which, after .interposing a motion for new trial as well as a motion in arrest of judgment and saving exception to the overruling of these motions, the American Bakery Company duly perfected its appeal to this court.

The learned counsel for appellant, in their printed argument upon which the cause is submitted, state that errors are assigned in only two respects in this case, aimed at the foundation of respondent's right to recover, and that question, counsel frankly state, is the only one they present for the consideration. of the court; and whether error exists in the matter of giving or refusing instructions, save as to the instruction in the nature of a demurrer to the evidence, is a question which counsel say they will not discuss ''for the reason that if respondent is entitled to recover under the theory pleaded and the evidence offered, we have no fault to find with the verdict and we see nothing to be gained by another trial.'' This very frank statement of counsel leaves as the only matters for our consideration the evidence and the action of the trial court in overruling the demurrer thereto. It is the contention of counsel for appellant that there is an entire failure of proof in the case entitling plaintiff to a recovery, and that the evidence in the case proves that under the law, plaintiff cannot recover.

The determination of these points involves a careful consideration of the testimony in the case.

Preliminary to taking up the testimony as to the accident, it is as well to say that the appliance referred to as a whirligig in the petition was also called an aeroplane by those who testified. One of these whirligigs was in evidence and a photograph of it is in the abstract. We shall hereafter designate it as the toy. Without reproducing the photograph, it is sufficient to say of the toy that it appears to have been composed of a pasteboard stem about eight inches

long and about five-sixteenths of an inch in diameter. The stem is about the size of an ordinary lead pencil. It is hollow in the center. At either end two small wires about as large in thickness as a very small pin extend out at right angles from the stem for a distance of four inches and then each wire bends, forming practically a right angle with the balance of the wire, and extends then about two inches. On each of these wires thus shaped a pice of very thin glazed paper is pasted so that each piece of paper is triangular in shape These pieces of paper constitute what may be called "wings." By taking hold of the stem and holding it stationary and winding the two wings at the bottom and then letting go of the stem, this toy will sail through the air until the two wings, thus wound up, unwind, when the toy will drop to the ground. Small rubber bands extend from the wires, through the hollow part of the stem, and the winding process consists of simply twisting these rubber bands around each other until they are tight, the unwinding of these bands causing the wings of the toy to revolve, thus keeping the toy in the air as long as that continues, dependent also on the velocity of the wind. There was no controversy over the fact that this toy was an advertising device, having printed on the wings matter calling attention to defendant's products. When sent up from the wagon by whoever was manipulating it in the manner before described, the toy will sail in whatever direction the wind happens to carry it.

Turn now to the testimony as to the happening of the accident.

Alexander Hight, the plaintiff, offered as a witness, was questioned by the court as to his conception of the obligation of an oath. Plaintiff, being accepted as a competent witness, said he was ten years old; had been going to school for four years. He testified that he was ten years of age in August following the accident, which had occurred on Saturday, July 9,

1910; that about eight o'clock on the morning of the day of the accident he was on the corner of Dickson street and Garrison avenue, playing with three other boys; saw the wagon around the corner. The people on the wagon threw out one of these toys and the boys ran after it and it flew under the wagon. He (plaintiff) thought the wagon was stopping. He stuck his hand under the wagon to get the toy which had fallen there or which had been carried there. The wagon then began to go faster and ran over his hand, or more properly, the arm, and crushed it. He did not remember how many of these toys had been thrown out before he was hurt. One of the boys on the wagon took the toy from under the seat and wound it up and it began flying around the wagon. After it flew under the wagon he (plaintiff) went to get it. When he undertook to do that he did not think of the wagon going over his arm; that when one of these toys had been thrown up before, the boys all began running after it. Plaintiff exhibited his injured arm to the jury.

On cross-examination plaintiff testified that his home was on the north side of Dickson street, about eight houses east of Garrison avenue; had lived in that house about four years, during all of which time he had attended the Divoll School, which is about a block south of where plaintiff lived. On the morning of the accident he was playing on the corner of Dickson street and Garrison avenue; was playing on the south side of Dickson street in front of the house in which one Charles Barnett lived; was on the south side of Dickson street when he first saw the wagon. He and the other boys were playing with some pictures and after awhile the wagon came around the corner and they were throwing out these toys and he and the other boys all ran after them and one of the toys flew under the wagon and began whirling around. He did not remember how many toys he saw thrown

out that morning; had seen some others thrown out but did not know where they went. When the one was thrown out which he tried to get, the wagon and team were two or three houses east of Garrison avenue; that before the wagon got around the corner he (plaintiff) was in front of Charles Barnett's house; when the whirligig was thrown out he (plaintiff) went further down the street, all the time on the south side of the street. The people on the wagon threw out the toy on the north side and it began going around on the north side. He ran around the back end of the wagon to the north side of it, got on his knees and reached between the front and rear wheels on the north side of the wagon. When he got on the north side of the wagon he was within fifteen or twenty feet from the car track. During all this time the team was moving, the driver of it sitting on the south side of the wagon. There were milk cans on the wagon, piled up about two feet or more, the highest part of the load being in the middle of the wagon. The top of the row of cans in the center of the wagon came above the top of the seat about a foot. The driver was sitting on the south side of this row of cans, sitting on the seat of the wagon. After the wagon ran over his arm it went about four houses and then stopped. The team was walking all the time, going very slowly. When plaintiff started for the south side of the street to run around the rear end of the wagon, he did not notice what the driver was doing. The remainder of his testimony related to the extent of his injury. On being recalled for further cross-examination, plaintiff testified that the wagon referred to was a large wagon and that he did not think at the time that if he got his arm under the wheel he would be hurt; he thought the wagon had stopped; he knew if he got in front of a moving wagon or got his hand under the wheel and the wheel ran over it, he would be hurt but he "thought this wagon would stop and wouldn't go for a long time." This is sub-

stantially all the testimony of plaintiff himself relating to his injury.

A witness named Blum, testifying for plaintiff, said in direct examination that he was a shoemaker by trade, living at 2933 Dickson street. He was on the front stairway of his house on the day of the accident examining his mail. He saw a team and wagon, the latter loaded with fancy milk cans and one man standing in the center of the wagon throwing off some toys and two men sitting on the wagon; that the toys that he saw were similar to one shown at the trial; saw one of them fly around the wagon and around the horses and eight or ten boys were running after it to get hold of it. Witness looked back at his mail and in a half minute heard something and looking again saw plaintiff being pulled from under the wheels of the wagon; saw the children running to get these toys; after the accident, had assisted in carrying plaintiff to his home, he living in the same apartment with plaintiff and knowing him before he was hurt. On cross examination he testified that he saw the team come from the south side of Garrison avenue and turn east on Dickson street, keeping on the south side of that street. There was a single car track on Dickson street and the wagon was on the south side of the car track and going east. It was about three doors away from the corner of Garrison avenue on Dickson street that he saw them take plaintiff from under the wagon. When the accident occurred witness was three or four houses east of where the accident occurred and when it occurred the wagon was going toward the east. The horses were proceeding at a walk. The boys were taking plaintiff from back of the rear wheel; the rear wheel had gone over plaintiff. They were taking him out on the north side of the wagon; that he (witness) "is not quite sure whether there were three people on the wagon because he got excited;" that the wagon was loaded with some new milk cans piled like steps,

the row in the center being the highest. They were about four and a half feet high from the bed of the wagon and eight or ten inches higher than the seat on which the driver was sitting. After the accident happened the wagon and team continued on east on Dickson street. The accident happened about 8:30 o'clock in the morning and he saw plaintiff before the wagon came along. Plaintiff was then on the corner of Garrison avenue, playing with some other boys on the sidewalk on the north side of the street. He saw plaintiff when he left to go toward the wagon. Plaintiff and six other boys ran out when they saw the team coming and started to run after the toys; that there were one or two toys sent up before the wagon passed the boys and then the wagon turned in onto Dickson street and some more were thrown out. The wagon was some ten or twelve feet from the corner before plaintiff ran out from the sidewalk, he being on the north side of Dickson street and on the east side of Garrison avenue, on the northeast corner of Garrison and Dickson. On redirect examination this witness testified that he thought there were three persons on the wagon; could not tell how large they were; they were the men or boys who were managing the wagon.

Charles Barnett, sixteen years old, a witness on behalf of plaintiff, testified that at the time plaintiff was injured he (witness) was standing on the steps of his home, which was the corner house on the southeast corner of Dickson and Garrison; saw four or five boys there on the street; saw defendant's wagon coming down Dickson street; that when it was in front of his house the people on the wagon let one of the toys go and it went in the street. A little further down they let out another one of these toys which went to the north of the wagon and then between the front and back wheels. "The boys were out there trying to get this whirligig." Plaintiff got down on his knees and reached under the wagon, which was going slow

and reached between the two wheels and the back wheel passed over plaintiff's arm. The people on the wagon had thrown out one of these toys before they threw the one out which plaintiff was trying to get when he was injured; that this latter toy did not go up very far, went about fifteen feet and he "guessed" the wind carried it between the two wheels. There were two men on the wagon. Plaintiff had been playing around there for some fifteen minutes. The wagon was going pretty slow and the horses were in a slow walk. On cross-examination this witness repeated that when the wagon passed witness and when the accident happened the horses were going in a walk. There were two boys or men on the seat of the wagon. The seat was on the front part of the wagon and one of these people was driving and one of them was giving out these toys; that the one driving was on the right hand or south side of the seat and the one throwing out the toys was sitting on the north side of the seat. Witness saw plaintiff run out to get the toy and get down on his knees on the north side of the wagon between the front wheel and the rear wheel of the wagon and reach under the wagon and between the wheels to get the toy and while reaching in there the rear wheel on the north side of the wagon ran over his arm. Some man came along the street and called to those in the wagon, "Stop, you have hurt a boy." They immediately stopped. Those on the wagon had been looking ahead of them; did not notice either of them turning around at any time. Plaintiff ran out from the sidewalk from behind the wagon. The team and part of the wagon had gone on by plaintiff. Three boys started out toward the wagon with plaintiff; they all seemed to be in a hurry but witness had not noticed whether they were running or not; they were all together ready to get the toy, but they didn't get down after it.

Julian Hight, an older brother of plaintiff, testified that he was with plaintiff at the time of the accident. Before it happened he and plaintiff had been playing on the sidewalk on Dickson street. They saw the wagon coming over and one man was winding up the toy which was thrown into the air and they all ran after it. Plaintiff ran after it and it went under the wagon and plaintiff stuck his hand under between the two wheels and went to jerk his hand out when the wheel went over his arm. The wagon was going very slowly. There were two persons on it, one of them driving and the other throwing out the toy. When the toys were thrown out the children ran after them. All the boys ran after them and tried to get them.

On cross-examination this witness testified that they were all playing on the south side of Dickson street; that they started from that side when they ran after the toy; they saw the wagon and ran across the street and stopped and ran toward the west to come up with it; ran across the street in front of the wagon, running on the north side of Dickson street, then turned and ran back on Dickson street; when the toy was thrown out they (the boys) were on the south side of the street and the toy went toward the north and then south under the wagon; the boys all chased it from the south side across to the north side and until it went under the wagon between the front and rear wheels on the north side. The wagon was going all the time. His brother reached under the wagon to get the toy from between the front and rear wheels. There were milk cans on the wagon and banners on the side of it with the name of the brand of bread manufactured by defendant.

Beyond the testimony of the surgeon and of a sister-in-law of plaintiff as to the extent of plaintiff's injury and his suffering, this was all the testimony in chief for plaintiff.

Defendant at the close of the testimony in chief asked an instruction that under the pleadings and evidence plaintiff was not entitled to recover. This was refused and exceptions saved.

Defendant put on a witness who testified that he lived on Dickson street at the time of the accident; was on the corner of Dickson and Garrison waiting for a car. Defendant's wagon turned the corner to go east on Dickson street; as the wagon came down a hundred feet from the corner a man on it threw out one of these toys. The boys were near the northeast corner of Garrison and Dickson. They ran toward the back of the wagon and one little boy ran ahead of the rest of them, laid on his stomach, reached his arm under the wagon between the first and second wheel and his arm was run over. A street car coming along, witness got on it and as the car caught up to the wagon, witness called to the driver to stop that he had run over a boy. The driver had not known it. There were two people on the wagon on the front seat. The wagon was loaded with milk cans, three rows high, the highest part of the load of cans being in the center. The person driving the team was a young man between twenty-two and tweny-five years old. He was sitting on the right hand side of the wagon to the south of the row of cans that was highest. Witness saw plaintiff before he ran out into the street. He (witness) was then standing at the second door from the corner of Dickson and Garrison on the north. The team was going very slowly; it went about fifty feet after running over plaintiff before it stopped. Plaintiff had left the sidewalk as soon as this advertising toy was thrown out and was about ten feet from the rear end of the wagon before he started to crawl under. On cross-examination this witness testified that he stood four or five minutes waiting for a car; that in the meantime this wagon had gone about a

168 Mo. App. 29

hundred or a hundred and fifty feet east of where he was standing; that nobody picked plaintiff up. That after it ran over the plaintiff's arm, the wagon went on about fifty feet, when witness called to the people on the wagon to stop. He did that because the driver had not seen the accident. Plaintiff was about seventy-five feet from witness when he was run over; he' was run over about a hundred feet from the corner and witness was about twenty-five feet from the corner, which he "deemed" about seventy-five feet between him and plaintiff, when plaintiff was run over. This is all the evidence offered by defendant.

This is substantially all the testimony in the case as before stated, except that relating to the extent of the injury and the length of confinement of the plaintiff. As counsel make no point on the amount of the verdict, provided one is to be returned at all, it is unnecessary to set out this part of it.

REYNOLDS, P. J. (after stating the facts).—Beyond all question this case was pleaded by plaintiff and tried on the theory that it was one involving what is sometimes called "the turntable," or "attractive nuisance," or "attractive appliance" law.

Referring to that doctrine as applied to cases of injuries to children sustained by playing around or resorting to such appliances, and without any desire to go into a full discussion of it or pedantically to go over its history, it is not improper to say that it is generally conceded to have had its origin in the decision by the Court of Queen's Bench in the case of Lynch v. Nurdin, 1 Adolphus & Ellis (n. s.) 422, also reported 41 E. C. L. 422. It is rather curious to note the various constructions that have been placed upon Lynch v. Nurdin, a decision announced by Lord DENMAN, Chief Justice of the Court of Queen's Bench, in 1841, by the several courts, not only of our country but of Great Britain. Great diversity of opinion has

been shown as to the exact meaning and scope of that decision. A very full citation and careful analysis of the decisions of the various courts on this much vexed question is in Bottum's Admr. v. Hawks, 84 Vt. 370, 79 Atl. 858. We refer those desirous of going into this question to the opinion of Judge Powers in that case.

Whatever diversity of opinion there may have been in the courts of Great Britain as to what was really decided in Lynch v. Nurdin, so far as the courts, of that country are concerned its interpretation seems to have been definitely settled by the decision of the House of Lords in Cooke v. Midland Great Western Railway of Ireland, L. R. App. Cases (1909), 229, in which latter case Lynch v. Nurdin is expressly approved and applied in a turntable case.

Sioux City & P. R. R. Co. v. Stout, 17 Wall. 657, is the first case in the United States Supreme Court in which the turntable question arose and in which it was recognized in connection with injury to a child, who had played about it. It reached the Supreme Court on error to the circuit court of the district of Nebraska, in which court the case had been tried before Judges Dillon and Dundy. [See 2 Dillon R. 294, s. c., Fed. Cases, Nos. 13,503 and 13,504, pp. 181-183.] Mr. Justice Hunt, who delivered the opinion of the Supreme Court, an opinion concurred in by all the justices, cites Lynch v. Nurdin as authority in support of the claim of liability for injuries to a child sustained while playing with a turntable. There has been very great discussion of and disagreement as to the Stout case in the decisions of the State courts which followed after that case had been determined, the applicability of Lynch v. Nurdin to a turntable case being sharply challenged. That its principle was to be applied to such cases in the national courts was finally and definitely determined by the Supreme

Court of the United States in Union Pacific Railroad Co. v. McDonald, 152 U. S. 262.

Turning to the decisions in our own State, it will be found that the rule invoked in the turntable cases has been under consideration by our court as well as by the Supreme Court in several cases. As said by Judge Lamm in Kelly v. Benas, 217 Mo. 1, l. c. 11, 116 S. W. 557, referring to the turntable rule, "It is established in our law, and doubtless on principle ought to be applied (in those jurisdictions asserting the doctrine) to other cases coming strictly within the limits of the doctrine and presenting every earmarking element upon which liability is predicated in the principal case. While this is so, the manifest distress and injustice flowing from unnecessarily extending the doctrine, or loosely applying it to many conceivable cases, has caused those courts accepting it to restrict its application to the narrowest bounds." Citations of numerous cases from our Supreme Court illustrating this follow. [See particularly Witte v. Stifel, 126 Mo. 295, 28 S. W. 89; Barney v. H. & St. J. Ry. Co., 126 Mo. 372, 28 S. W. 1069.] The last reported decision of our Supreme Court on the question to which our attention has been called or which has come under our observation is the case of O'Hara v. Laclede Gas Light Co., 244 Mo. 395, 148 S. W. 884. In this latter case Judge Graves, who delivered the opinion of the court, quotes at length from the decision in Brown v. Salt Lake City, 33 Utah 222, l. c. 236, and following, as stating the position of the several courts throughout the country on this rule. We refer to that case and to the quotation from it made by Judge Graves. Among other cases cited in Brown v. Salt Lake City is the case of Overholt v. Vieths, 93 Mo. 422, 6 S. W. 74. Following the quotation above mentioned, Judge Graves refers for a full review of all the cases of our Supreme Court beginning with Overholt v. Vieths, supra, to the recent case of Kelly v. Benas, supra,

quoting at length from that case. Discussing the facts in O'Hara v. Laclede Gas Light Company, supra, Judge Graves says: "In fact, the turntable cases are anomalous, and it is the practice of the courts to carry their doctrine no further than the previous decisions compel." So it is held by our court in Houck v. Chicago & A. R. Co., 116 Mo. App. 559, l. c. 568, 92 S. W. 738; Marcheck v. Klute, 133 Mo. App. 280, l. c. 291, 113 S. W. 654. The conclusion in the O'Hara case is that the theory of the turntable or attractive nuisance cases was not applicable to such a case as the one then before the court.

It is further said by the court in that case that the plaintiff had constructed her petition on the turntable doctrine of negligence and that so constructing it and submitting the case to the jury on that construction of it, it was unnecessary for the court to concern itself in an endeavor to arrive at the proper construction to be given to the petition; that "by the theory adopted below she (plaintiff) is bound here." This applies to the case now before us. That this case is distinctly presented by the petition and by the evidence as one in which the doctrine of the turntable, attractive nuisance or attractive appliance cases is sought to be invoked, is clear.

Whatever diversity of views may be held by the courts as to the application of the doctrine, or even as to whether it can be sustained at all, it is fairly clear that these factors are held by all the courts recognizing the doctrine as necessary to its application: First, the machinery or appliance, the operation of which was the direct cause of the injury, must have been a dangerous appliance in itself when set in motion, as is a turntable; or it was of a kind liable to become dangerous from the position or condition in which it is left, if set in motion, this latter seeming to fall in with Lynch v. Nurdin. There the dangerous appliance, if we may call it so, was a horse and cart,

articles neither in themselves nor in combination dangerous. Second, negligence by the defendant in leaving these appliances or things so unguarded, unsecured or unattended, in an open place frequented by children, as to allow of their being put in motion by the children who obtain access to them. It is to be noted that the doctrine is applied only in those cases in which the person injured is a child, one of tender age; on the borderland, as to years, between the irresponsibility of childhood and the responsibility of those of mature years. No case assumes to apply the doctrine to an adult. It is clear from all the cases, that at the very foundation of liability for the injury is the negligence of the defendant. Unless that is proven, the benefit of the rule cannot be invoked. It seems pretty well settled, on analyzing the cases, that the rule is to be invoked, not as a foundation for the liability of the defendant, but to meet the defense of contributory negligence on the part of the plaintiff, a child, injured. It is applied, not as a weapon of attack or as a ground for liability, but as a defense on the part of the plaintiff, a minor, one of tender years, against liability for his own acts of negligence, carelessness or even trespass in going upon the premises where the appliance is maintained. This is made very clear by Bottum's Admr. v. Hawks, supra, even though Judge Powers, speaking for the Supreme Court of Vermont in that case, says that it seems "from a patient consideration of the whole subject in the light of all the cases at hand, that it is impossible to justify the doctrine on common law principles." As is well argued in that case, while suffering a dangerous appliance, which in itself or in its position was a menace to children to remain unguarded, was an act of deliberate carelessness, "it does not necessarily follow that this action will lie. 'Negligence' and 'actionable negligence' are distinguishable terms; carelessness does not always involve liability. Before liability attaches,

a duty must arise—a duty on the part of the party charged toward the party injured. So," says Judge POWERS, "our discussion begins with the question: Did the defendant owe the intestate a duty, and, if so, was it the duty of active care? If the answer to both branches of this question is affirmative, then, so far as the main question is concerned, liability is stated in this declaration."

In the case at bar we do not think it necessary to place our decision upon the construction of the petition to determine whether it states any cause of action. There is a verdict and judgment in this case, so that if a cause of action is stated, although imperfectly, the defendant having pleaded over after demurrer, there would be no cause for setting aside the verdict or arresting the judgment. That the petition in this case states a cause of action is not challenged. That it distinctly proceeds upon the theory of an attractive appliance and is distinctly bottomed on the doctrine of the turntable cases and that the case was tried upon that theory in the circuit court, admits of no doubt, as we have before remarked. What is claimed by counsel for appellant is a failure of proof of the material averments of the petition.

Returning to a consideration of the evidence in the case, substantially all of which we have set out, we are confronted with the question as to whether that evidence entitled the plaintiff to go to the jury; whether it shows actionable negligence on the part of defendant.

It is averred that plaintiff, a child, saw one of these toys fall under a wagon being driven by employees of defendant and rushed out to obtain it, placing his hand and arm under the wagon to get it. The actionable negligence then here charged is that defendant's employees driving the wagon "did then and there carelessly and negligently cause the hind wheel of said wagon to pass over plaintiff's right

arm.'' Again it is averred, that defendants and their
employees ''in driving said wagon, and throwing said
whirligigs into the air, knew, or by the exercise of or-
dinary care could have known that said toys would
attract plaintiff and other children of immature un-
derstanding into a place of danger of being injured by
said wagon, and cause them to rush to obtain such
whirligigs as would fall under the wagon, and that in
doing so they were likely to maim or kill such children
by running over them,'' and it is charged ''that the
act of so driving over the streets and with such heavy
wagon, throwing such whirligigs into the air, as afore-
said, and thereby enticing children to struggle to ob-
tain said whirligigs, and to place their hands and arms
under the wagon to obtain the same, and driving heed-
lessly, without noticing a child who had put his hand
and arm under the wagon to obtain such whirligig, and
passing over and crushing and breaking his arm, was
an act of negligence on the part of the defendants.''
It is furthermore averred in the petition that ''it was
the purpose of the defendants in causing said large
wagon to pass through said Dickson street, and in
causing said whirligigs to be thrown into the air, to
attract the attention of children thereto, and that said
whirligigs were exceedingly attractive to children, and
in this way defendants sought to advertise, and did
advertise their commodities.''

Taking up this last assignment first, it is to be
said of it that it is entirely unsustained by any evi-
dence in the case. There is not a syllable or line of
testimony tending to show that it was the purpose of
defendant to attract the attention of children to the
whirligigs, the wagon or the products of the defend-
ant. Nor is there any evidence in the case from which
any such purpose may be said to have been proven.
It is not to be inferred that the children residing on
the streets along which this wagon was driven and
the toys turned loose were prospective customers. The

advertising of the product undoubtedly was intended to reach housekeepers; the toys and the piled up cans, the banner on the wagon, were all parts of an advertising scheme. But it is a far cry to say that by attracting the attention of the children to the toys the attention of the consumers would be attracted to the product. Yet this is the argument that must be relied on to sustain this averment of the petition. It is argued by counsel for appellant that this is a material averment in this petition. Those counsel argue that if the purpose of sending up these whirligigs or toys was to invite the attention of children and to cause them to congregate around the wagon of the defendant for the purpose of increasing the business of defendant, it would seem that defendant owed respondent a very different duty from that which it owed him if he got in the way of the wagon through some impulse of his own and without appellant's knowledge or consent. We think this is a sound argument. We further agree that the burden of proof of this averment was on the plaintiff, respondent here. We hold he has failed to make any proof of it.

Recurring to the other allegations of negligence, careful consideration of the testimony in the case forces us to the conclusion that it fails to establish any actionable negligence on the part of defendant's employees. It appears by the evidence that defendant's employees were driving the team and wagon through the public streets of the city of St. Louis. This they had an undoubted right to do: the right of access to and user of those streets. That the team was being driven at a slow walk, is the unvarying and uncontradicted testimony of every witness in the case, witnesses produced and introduced by plaintiff. Even the plaintiff himself so testified. There were two persons on that wagon in charge of the team and of the appliances, one of them the driver, the other a young man who was turning loose these toys. It is true that

one of plaintiff's witnesses testifies that he thought he saw three people there, one of them standing in the center of the wagon throwing out these toys. This witness did not state that as a positive fact but stated it as a matter of opinion about which he admitted he was not certain. He is contradicted in this by every other witness of the plaintiff, all of whom were much nearer to the wagon at the time the accident happened than that witness. He was some distance from it and at the time, as he himself testifies, was engaged in opening and examining his mail, which he had in his hand. He says he looked up in a very casual way at the wagon as it passed him. Obviously he paid no particular attention to it or as to who was on it, until he saw his neighbor, the plaintiff, being picked up after the wagon had passed over his arm. He is contradicted in his assertion of there being three people in this wagon by material facts in the case. He says that he thought this third person was standing in the center of the wagon, while the evidence of every other witness in the case is that the center of the wagon, the bed back of the seat, was filled by tin cans which were piled up in the shape of a pyramid or steps, the apex of the pyramid directly over the center of the wagon and above the seat upon which the two occupants in charge of the wagon were seated. We can assume that there were two persons in charge of this wagon and seated at the proper place in the wagon on the seat. The driver was attending to the team, the other person, apparently a boy or young man, in front of this pyramid or pile of tin cans and on the seat, taking these toys from under the seat, winding them up and throwing them into the air. Both were looking to the front. Beyond question these were guilty of no actionable negligence in driving this wagon. They did not know that they had run over anyone until after the wagon had gone some distance and were then told of it by a bystander. It would be a hard rule

to say that those in charge of a team were required to look behind them to see if any accident was liable to happen after their vehicle had passed. All of our courts which have passed on the question of the duty of those driving a team or an engine, have, so far as we have read, confined the duty of the driver to ''looking ahead,'' according to whether he was advancing or backing with his vehicle. We know of no case laying down any duty upon these to look behind and watch to see what has happened after the vehicle has passed. There is an exception to this rule, in so far as automobiles are concerned. [See section 12, Acts 1911.] Their attention is and must be to the front. They were liable if they ran over any one who was in front or could be seen in front of them, or were going at such speed as to endanger those who might also be using the public ways.

The evidence is without contradiction that these toys were thrown out toward the front of the wagon, or toward the side. If any of them passed behind the wagon they, and any one running after them, were out of the vision of the persons in charge of the wagon and who were sending the toys into the air. Nor can it be said to be an act of negligence on the part of those persons that they did not watch the flight of these toys to see what happened in connection with loosening them on the public street. There is not a particle of evidence tending to show that any boys followed any one of these toys except the boys who followed this particular toy, and which this plaintiff endeavored to secure. Plaintiff and these boys did not go in front of the team. They went behind it. There is evidence that other of these toys were set flying, but as to where they flew, what became of them, is without any evidence. Nor is there any evidence in the case that any children, or any other person for that matter, attempted to secure them or ran out into the street to get hold of them. That the toys were attractive to

children is beyond question. But conceding that is far from admitting that it proved or even tended to prove that those setting them off had any reason to apprehend that children would follow them under the wagon, especially go between the wheels of the wagon while it was in motion for the purpose of getting one. In fact plaintiff was the only boy who did reach under the wagon. It cannot be held that the law would require those in charge of this wagon, when they threw out one of these toys, to watch its flight, and to stop the team until they saw what had become of it; such requirement would be unreasonable. There was nothing therefore about the manner in which these toys were set free by the employees of defendant, or from the actions of the boys on the street, to warn them that setting the toys free was liable to inflict any injury whatever upon anybody. It was not actionable negligence, as we hold, to set loose these toys.

As every witness testifies, even as this plaintiff himself testifies, when the boy, the plaintiff here, put his arm under the wagon to get hold of this toy, to reach it, he knew that the wagon was moving, that the wheels were turning. He was old enough to know that if he put his arm in front of a moving wheel and left it there, that he was going to be hurt; he was of sufficient discretion to know that; he says he did know it. His excuse is that he thought the wagon had stopped or was going to stop. It is not likely, from the facts in evidence in the case that he thought anything about this. Like any other boy of his age, the chances all are that at the time, if he thought at all, he thought he would be quick enough to get the toy from under the wagon before the wheel would reach him. He took that chance and lost. The doctrine of attractive appliances, of the turntable cases, is therefore inapplicable here and cannot relieve plaintiff of the charge of contributory negligence; cannot be used to put the

responsibility for the injury, which he undoubtedly sustained, upon this defendant.

Furthermore, the alleged attractiveness of the toy was not the *causa causans* of the injury. That was a remote cause. The immediate cause was plaintiff placing his arm between the front and rear wheels of a moving vehicle; one that he knew was moving and which he had no reason to believe would stop.

For all these reasons, we are of the opinion that plaintiff cannot recover and that the learned trial court erred in sending the case to the jury. The judgment of the circuit court is accordingly reversed. *Nortoni* and *Caulfield, JJ.,* concur.