GEORGE L. WEBER et al., Respondents, v. UNITED RAILWAYS COMPANY OF ST. LOUIS, a corporation, Appellant.

St. Louis Court of Appeals. Argued and Submitted May 6, 1919. Opinion Filed June 3, 1919.

1. STREET RAILROADS: Negligence: Failure of Motorman to See Boy Coasting: Condition of Vestibule Windows. In an aciton against a street railroad to recover damages for the death of a boy whose sled collided with a street car whilst the boy was coasting, the defendant cannot avail itself of its own negligence in failing to keep its car windows in such condition that the motorman managing the car could see out of them.

2. ———: ———: Motorman's Duty to See Boy Coasting: Vigilant Watch Ordinance. Furthermore, irrespective of the condition of the car windows, under the ordinance of the City of St. Louis (section 2380, Ordinance 26653, Rombauer's Ed. 1912; Section 1053, fourth Par., Ordinance 30013. p. 1094, Wagner's Ed. 1914), and even outside of the ordinance, the motorman could and should have seen the boy as he came down the street, his sled slipping over the ice and snow in the street.

3. ———: ———: ———: Line of Vision. Where a boy coasting did not approach the street car from the rear, but came first towards its front end, then towards its side, he coming into col-

lision with the rear wheels, and the motorman had an unobstructed view for a long distance up the avenue and the boy was within the line of vision of the motorman, and the slightest attention to the surroundings would have been sufficient to put him on his guard, nothing less than gross negligence can be attributed to the motorman in failing to see the boy.

4. ——: ——: Injuries to Boy Coasting: Evidence: Case for the Jury. In an action against a street railroad to recover damages for the death of a boy whose sled collided with a street car whilst the boy was coasting, *held* that there was substantial evidence warranting the submissions of the case to the jury.

Appeal from the Circuit Court of the City of St. Louis. —*Hon. Thos. L. Anderson*, Judge.

AFFIRMED.

*T. E. Francis, Chauncey H. Clark* and *Thomas Bond* for appellant.

(1) There is no duty on the part of a motorman to keep a lookout for boys coasting over the street car tracks, unless he sees or knows that they are doing so. It appears from plaintiffs' own case that these boys came out of a side street, Camelia avenue, behind the motorman, and followed the car down the hill, and the uncontradicted testimony of the motorman is that he never saw any boys coasting on the hill on this occasion. Under these circumstances, he had no reason to anticipate, while running his car around this loop, that he would encounter boys coasting over the tracks on sleds, and having no reason to anticipate any such situation, he was under no duty to keep a lookout therefor. Kiley v. Boston Elevated Ry. Co., 207 Mass. 542, 93 N. E. 632, 31 L. R. A. (N. S.) 1153; Siacik v. Railway Co., 48 Atl. (Md.) 149; Hight v. American Bakery Co., 168 Mo. App. 431; Gallagher v. Crescent Ry. Co., 37 La. Ann. 288; Funk v. Electric Traction Co., 172 Pa. 559; Osborne v. Bay Street Ry. Co., 222 Mass. 427; Selmdea v. Worcester Consolidated St. Ry. Co., 223 Mass. 76; Boulhillier v. St. Ry. Co., 189 Mass. 537; Bier v. Camden, etc., Ry. Co., 52 Atl. Rep. (N. J.) 215. (2) Even

if it could be held (which we deny) that the circumstances of this case imposed a duty upon the motorman to anticipate the presence of boys coasting across these tracks on sleds, and to keep a lookout for them, the uncontradicted evidence in the case shows that it was impossible to see deceased on account of the condition of the windows on the left side of the street car, due to the action of the elements. There is no charge in the petition that the defendant was negligent in not removing this condition, that is to say, in operating its street car with the windows obscured by ice and snow. The only specification of negligence in the petition and the only one on which the case was submitted to the jury is the last chance rule. This rule operates on conditions as they are, not as they ought to be, and only imposes upon the defendant the duty to take preventive measures which are open to a man of ordinary prudence under conditions as they exist. If, therefore, these conditions as they existed at the time deceased reached a place of danger, made it impossible for the motorman to see him and avoid injuring him, then there was no negligence on the part of the motorman in failing so to do. McGee v. Railroad, 214 Mo. 530, 541; Grear v. Harvey, 177 S. W. 780, 782; Same case, 182 S. W. 961. (3) According to plaintiffs' evidence, when the car started up to turn out of the loop onto the straight track, deceased was coasting on his sled about at the west curb line of Taylor avenue, seventy-three feet from the point of collision, going slowly, about as a man would walk. Plainly, at such a distance and under such circumstances, he was in no danger. And even had the motorman seen him there on Taylor avenue playing with his sled, there was nothing to indicate to the motorman that he was in any danger, and there was no negligence on the motorman's part in continuing the car around the loop. Cole v. Met. St. Ry. Co., 121 Mo. App. 605, 613; Keele v. Railroad, 258 Mo. 62, 79. (4) Reading the testimony in this case most favorably to the plaintiffs, it shows only an occasional use of this hill by boys for sledding. All the

witnesses would say was that at times, when weather conditions were favorable, they had seen boys coasting on that hill, though it was only done furtively and occasionally, because the policeman on the beat would break up the practice every time he saw the boys engaged in it. It is not shown that boys had used this hill for coasting on more than one previous occasion that winter, and it is not shown that these boys had been coasting for any time on the day in question prior to the trip down the hill in which deceased was injured. It is apparent, therefore, that all that this evidence shows is an occasional use of the hill for coasting and not a regular or continuous or notorious use, of such a character as to amount to a custom, or to impose any duty upon those in charge of street cars in reference thereto. S. E. McMiens v. United Railways, 202 S. W. 1082; Parker v. Railway Co., 180 Mo. App. 185; Shields v. Railway, 87 Mo. App. 637.

*Earl M. Pirkey* for respondents.

(1) It is the duty of the motorman to keep a lookout not merely for persons on the tracks, but also for those moving towards it. Moore v. St. Louis Transit Co., 194 Mo. 12. (2) It is the duty of the motorman to be on the lookout for children on sleds approaching the track. Saulan v. St. Joseph Railway Co., 199 S. W. 714; Urbas v. Railway, 113 Minn., 312 Strutzel v. St. Paul City Ry. Co., 47 Minn. 543.

REYNOLDS, P. J.—Plaintiffs, husband and wife, parents of their infant son, George E. Weber, a minor, living with his parents, bring this action to recover damages for his death.

It is charged that on December 20, 1914, while the boy was riding on a sled on Lee Avenue, at or near Taylor Avenue, in the city of St. Louis, and while the sled with the boy on it was near the track of defendant's car line on Lee Avenue, at or near Taylor Avenue, the defendant and its motorman in charge of its

car negligently caused and permitted the car to move directly in front of the sled so that the sled with the boy on it collided with the street car, throwing the boy under the front of the rear wheels, whereby his arm was broken, right hand and arm badly mangled, torn and bruised, and the boy caused to sustain great nervous shock and injuries, from the effect of which he died on January 10, 1915. It is charged that at the time the boy was injured and for a long space of time next prior thereto, children had been frequently riding on sleds on Lee Avenue near Taylor, to the knowledge of defendant.

What is known as the "Vigilant Watch Ordinance" of the city of St. Louis was pleaded, that providing, in substance, that persons in charge of street cars "shall keep vigilant watch for all vehicles and persons on foot, especially children, either on the track or moving towards it, and on the first appearance of danger to such persons or vehicles, the car shall be stopped in the shortest time and space possible." This is section 2380, Ordinance 26,653, Rombauer's Ed. 1912; section 1053, Fourth Par., Ordinance 30,013, p. 1094 Wagner's Ed. 1914. It is charged that defendant's motorman, in violation or disregard of this ordinance, negligently failed to stop the car in the shortest time and space possible under the circumstances with the means at his command and consistent with the safety of passengers on his car, when he saw, or by the exercise of ordinary care, would have seen the boy on the sled approaching the track and in a position of danger from the car, and when he knew, or by the exercise of ordinary care, would have known, of the danger of the boy being injured. The damage to plaintiffs is placed at $10,000.

The answer was a general denial.

There was a verdict for plaintiffs and against defendant in the sum of $4000. Judgment following, defendant has duly appealed.

The defendant company maintains a double track along Lee Avenue in the city of St. Louis, upon which

201 M. A.—44

it operates its cars. Lee Avenue, seventy feet wide at the place of the accident, runs east and west. Taylor Avenue, sixty feet wide, runs north and south. The first street east of Taylor Avenue, which runs into Lee, is Camelia Avenue. East of Camelia and crossing Lee is Newstead Avenue. Leaving Newstead Avenue on Lee Avenue, both sets of tracks run west along Lee Avenue, crossing Camelia, until they reach the east line of Taylor. One track, the north one, curves from where it reaches the east line of Taylor, runs north and northwesterly on Taylor, making a curve out of Taylor into City Block 4414E, then into that block on a curve northerly and westerly, then south through the block to the south line of the block on Lee, then curving to the southeast on Lee, runs east on that avenue and across Taylor, then east along Lee to Camelia and on to Newstead and beyond, forming the south tracks. From the top of the loop to where the track straightens on Lee is about 170 feet. Cars coming from the east run along the north track around the loop and through the City Block and then curve into Lee Avenue, thence east along Lee to Camelia Avenue, to Newstead and beyond. The car in question had come from the east and around the north end of the loop and going south through the City Block, stopped about fifty feet north of Lee. It then started up slowly, going "as fast as a man can walk, just about," said one McGaughey, a witness for plaintiff. When it had turned into Lee avenue and was running west and was about seventeen or eighteen feet south of the south line of City Block 4414E, and about that distance north of the center of Lee, the accident occurred.

The City Block is unimproved, apparently used as a dumping ground. Lee Avenue is paved and improved with sidewalks, curbs and asphalt roadway to where it enters Taylor from the east and from then on, running west along Lee Avenue, it is not paved but is rough. The fall of Lee Avenue from Camelia to Taylor is about ten or twelve feet, the grade ending on Lee at the east side of Taylor; from there on and

along Lee, Lee Avenue is level. At the time, according
to the testimony of a witness for defendant, there were
no buildings on the northeast corner of Taylor and
Lee.

The accident happened on Sunday afternoon be-
tween 2:30 and 3 o'clock. Three boys, Hugo Kron-
miller, at the time seventeen years of age, Elmer Kor-
tum, at the time about twelve years old, and plaintiffs'
son, George Weber, at the time six years and seven
months old were coasting down this hill along Lee
Avenue between Camelia and Taylor Avenues. Hugo
was in front, George about half a block behind him,
and Elmer about half a block behind George. George's
sled, it seems, was a little faster than that of Hugo
and he was gaining on him as they went down the hill.
While the street car was running west on Lee, the
boys were following behind it. When the car turned
into Taylor and was going around the loop, Hugo
crossed the return track, that is the west track, on Lee
Avenue and in front of the car. The boys were all
riding "belly back," as it is called, on their sleds, body
and stomach on the sled, legs and feet out behind,
arms to the front. When Hugo crossed the west re-
turn track, he crossed about thirty-five feet from the
front of the car. The car was then going about twice
as fast as a man could walk or "a good walk," said
Hugo. He looked around after he crossed the track
to see what had become of his companions and saw
George, who at the time was on his sled, raising up his
hand and turning his feet, and then about three feet
from the car. George did not succeed in stopping his
sled, and it ran on and came in contact with the left
front wheel of the rear truck, the car then on Lee Ave-
nue and between fifteen and seventeen feet north of the
center of Lee Avenue. The street car had slowed down
after Hugo crossed the track and before George was
hurt. It had stopped after turning the upper curve,
and in the City Block, a few feet south of the top of
the loop; after that the car started up rather fast and
did not slow up any more until after it had ran ov

plaintiff. The place where the car slowed up was about where it was customary to stop, but on this occasion it did not stop. After George had come into contact with the car, it moved on some little distance along Lee and finally stopped about the east side of Taylor where it intersects with Lee. The other boy, Elmer Kortum, called as a witness by defendant and who saw the accident, had testified at the coroner's inquest that he and the other two boys had come down Camelia Avenue; that Hugo Kronmiller was first, then came George and then himself. Coming along Camelia, they turned into Lee; then west on Lee. George Weber was in the middle of the north street car track and witness near the track. The car made its bend on the curve or loop and was going pretty fast, but after that it slowed down. Witness thought George would hit the car but it slowed down and George ran into the back wheels. His testimony before the coroner being read to him at the trial, witness corroborated it, except to say that when George hit the car, it was going pretty fast and after he was hit it had slowed up.

After the men on the car found that they had hit George, they kept on going to where witness McGaughey had been standing to get on the car. The ground at the time was covered with sleet, snow had fallen on that, and on the day and at the time of the accident it had been raining. For that reason other boys who had been accustomed to slide on this hill were not there, the only ones at the time being the three named. Both Hugo and Elmer testified that they had been accustomed to slide down that hill and that the boys of the neighborhood had also been doing that, although on this particular occasion only the three of them were doing so. McGaughey testified to the same effect. When witness McGaughey saw the boy after the accident, he was lying on the side of the track, and the witness, the motorman and the conductor picked him up, put him on the car, took him to Newstead and Lee Avenues, and then to the office of a physician. The boy when he passed McGaughey,

was going as fast as a man could walk and then he slowed down; appeared to be trying to get off his sled.

There was also testimony from other witnesses, to the effect that this was a hill or slide that had been used by the boys for sliding for several seasons. Both the witness McGaughey and Hugo Kronmiller testified that they saw the motorman in the front of the car; that the motorman had slowed up before he got to the corner of the two streets and that the end of the car was just about off of Taylor when it stopped after the accident. While they had the boy on the street car after the accident he said to either the motorman or the conductor, "Why didn't you stop when you saw me coming? Look what you done to me."

This was substantially the line of testimony introduced for plaintiff, defendant interposing a demurrer, which was overruled, and then introducing its evidence.

For the defendant, a police officer testified that he had cautioned boys not to slide on this hill but he could not say that George was at the time among the boys to whom he had given this caution. On several occasions he had given this caution, but had not stopped them from sliding.

The motorman of the car testified that he did not know anything of the accident or of having run over plaintiff until a man had made him stop—hallooed to him to stop—and pick up a boy and take him along. This man (McGaughey) was standing on the corner of Taylor and Lee Avenues and about fifteen or twenty feet from where the loop runs into Lee. As he (the motorman) came out of the loop on to Lee, he had looked to see whether anyone was coming in either direction; could not see anything at the time because the windows were all frozen over with sleet and rain and snow; it had been raining and sleeting until the afternoon and during the first part of the morning; could not see out of the windows on the left hand side of the vestibule; could not see anything

at all on that side. (The boy had run into the car from the east; his arm and hand were run over by the front of the rear wheels on the left hand side of the car as the car ran south.) This witness (the motorman) further testified that he could not see very well out of the front; had seen a man standing on the corner but he was on the right hand side; the windows were clear on that side. The motorman also testified that he had not seen any children coasting on that hill; that he had seen them before that, but only remembers seeing them on one day, although he had been running on that line some four years; had only seen boys coasting there one day that winter but did not particularly remember seeing them any other day that winter, although he had seen them sliding down there during other winters. On cross-examination he stated that they had just taken that car out of the barn and the windows of the vestibule were in the condition described.

The conductor of the car testified that he did not know anything of the accident until the man on the corner stopped the car. This man went around back of the car and witness heard the boy screaming and that was the first he knew of the accident; had not seen the occurrence, he being in the booth, as they call it, in the rear of the car.

After evidence in rebuttal defendant again unsuccessfully demurred.

While the motorman, as stated, testified he had not seen any of these boys on this occasion, beyond question they were there, at least three of them, and beyond question one of the boys had passed over in front of the car on the day in question, and in a very short time—a matter of a moment or so—George, who was behind this boy Hugo, had run into the car. So that, irrespective of the condition of the car windows, it can be said, beyond any question, that under the ordinance of the city, and even outside of that, the motorman could and should have seen this boy as he came down the street, his sled slipping over the ice

and snow in the street. It is true that the condition of the car windows of the vestibule was not set up in the petition as a ground of negligence, but that fact did develop at the trial; in point of fact it was brought out by defendant itself. It can hardly be that de-fendant can avail itself of its own negligence in failing to keep its car windows in such condition that the motorman managing the car could see out of them.

It is argued that as this boy was hurt by coming in contact with the rear of the car, that he was not within the line of vision of the motorman; that his duty was to look to the front and not to the rear. We are cited in support of this proposition to our own decision in the case of Hight v. American Bakery Co., 168 Mo. App. 431, 151 S. W. 776, and to the decision of the Supreme Judicial Court of Massachusetts in Kiley v. Boston Elevated Ry Co., 207 Mass. 542. In the latter case it is held (l. c. 544) that there was nothing in the facts to show any negligence on the part of the motorman. "He must necessarily keep the street in front of his moving car constantly within his view. He must also be alert at all intersecting streets to avoid collision with travelers who would be likely to come therefrom upon his tracks. But ordinarily he is not bound to be looking out for travelers who may run into the rear of his car. The establishment of such a standard of duty would prevent to a large ex-tent the reasonably rapid carriage of passengers for which street railway corporations are chartered."

Speaking of a moving wagon, we held practically the same way in the Hight Case, supra. But neither of these cases on their facts fit the case at bar. This boy and his companions were coming down the hill and going west on Lee Avenue, a broad street, in plain view, and the motorman was crossing into and going along that very street with his car. It is true he had just entered upon the street and was moving towards the east, but under the facts in evidence he must be assumed to have had knowledge of the presence of these boys. Unlike the Hight and Kiley Cases, this

boy did not approach the car from the rear, but came first towards its front end, then towards its side, he coming into collision with the left rear wheels, but he did not approach the car from the rear. Before the collision he had been coming directly towards the car, either towards its front or towards its side. Hence this case is totally different, on its facts, from the situation presented in the two cases above referred to. Here the motorman had an unobstructed view for a long distance east up Lee Avenue, even when he was on the loop. The block on the northeast corner of Lee and Taylor, 100 feet long, had no obstruction on it. The boys were sliding down Lee Avenue directly in front of him. The slightest attention to the surroundings would have been sufficient to put him on guard. One boy, Hugo, crossed the track on his sled directly in front of the car. Nothing less than gross negligence can be attributed to the motorman in failing to see these boys.

While the learned counsel for appellant cite several cases from Massachusetts, outside of the Kiley Case, and from other states, as bearing on this case, a careful reading and consideration of them does not impress us with the fact that they are here applicable. The mere announcement of a principle, unconnected with the particular facts in the case to which it is applied, is of very little service. The cases which are guiding and controlling on us are those resting on conditions and facts before us. When the facts are entirely dissimilar then we cannot apply the principle there announced as applicable to an entirely different state of facts.

No complaint is made of the instructions or to the admission or exclusion of evidence. Reading the main instruction given at the instance of plaintiff, we think it is an exceedingly fair and accurate presentation of the law as applied to the facts here. The contention of learned counsel for defendant that its demurrers should have been sustained, is not tenable. There was substantial evidence warranting the submission of the

case to the jury. Their finding on the facts is controlling on us, there being no error of law.

The judgment of the circuit court is affirmed. *Allen* and *Becker, JJ.,* concur.

