HARRY KELLEY AND FLORENCE L. KELLEY, HIS WIFE, RESPONDENTS, V. NATIONAL LEAD COMPANY, A CORPORATION, APPELLANT.—210 S. W. (2d) 728.

St. Louis Court of Appeals.   Opinion filed April 20, 1948.

48

*Hugh D. McNew, John S. Marsalek*, and *Moser, Marsalek, Carpenter, Cleary* and *Carter*, for appellant.

50

*Gragg & Aubuchon* and *Wm. R. Schneider,* for respondents.

BENNICK, C.—This is an action to recover compensation for personal injuries and property damage allegedly sustained by plaintiffs, Harry Kelley and Florence L. Kelley, his wife, as a consequence of the negligence of defendant, National Lead Company, in causing and permitting gases, fumes, and chemical particles to be emitted from its chemical plant and discharged over the neighborhood where plaintiffs resided.

The action was brought pursuant to the authority of the new code, which permits all persons to join in one action as plaintiffs if they assert any right to relief jointly or severally in respect to or arising out of the same transaction or occurrence, and if any question of law or fact common to all of them will arise in the action. Laws Mo. 1943, p. 360, sec. 16, Mo. R. S. A., sec. 847.16.

Plaintiff Harry Kelley asked damages of $1,000 for his own personal injuries; plaintiff Florence L. Kelley asked damages of $500 for her own personal injuries; and both plaintiffs asked damages of $1,500 for damage to the real estate which they owned jointly.

Upon a trial to a jury, a verdict was returned awarding plaintiff Harry Kelley the sum of $500 for personal injuries, and awarding both plaintiffs the sum of $500 for damage to their property, but denying plaintiff Florence L. Kelley a recovery on her claim for personal injuries.

Judgment was entered in accordance with the verdict; and following an unavailing motion for a new trial, defendant gave notice of appeal, and by subsequent steps has caused the case to be transferred to this court for our review.

Defendant's plant is located in St. Louis County just south of the city limits of the City of St. Louis at the point where the River Des Peres flows into the Mississippi River. The surrounding territory is utilized for both industrial and residential purposes.

The plant was originally operated by the Titanium Pigment Company, but was taken over as a division of defendant company around 1935. The plant was constructed for the manufacture of titanium pigments, which are chiefly consumed in the making of paints.

An essential ingredient in the process of making pigments out of titanium ore is sulphuric acid, which, prior to 1934, had been purchased on the open market. However, in that year the original company decided to begin the manufacture of its own sulphuric acid; and in the period from 1934 to 1941 four separate units were designed and constructed under contracts with reputable, established firms with experience throughout the country in that particular undertaking. As a matter of fact, there is no suggestion in the record of any defect or insufficiency in the construction or installation of the plant.

The four units were designed to manufacture 93% sulphuric acid, and in the course of the process of operating the units certain fumes and mists escaped through stacks and were discharged into the surrounding atmosphere. There was some dispute regarding the density of such fumes and mists during the time before the war that defendant was merely engaged in the manufacture of 93% sulphuric acid. Defendant admitted that a few complaints were received during that period, but offered the explanation that the situation in those instances was usually found to be due to some particular set of circumstances occurring in connection with atmospheric conditions that would bring the fumes to the ground in the surrounding residential area. Indeed, defendant's evidence showed that prior to the outbreak of war, it was not unusual to delay operations, sometimes for several days, until the atmospheric conditions and wind direction would be such that if any undue amount of fumes and gases should be emitted from the stacks, they would not be carried into a residential area. On the other hand, plaintiffs' evidence disclosed that between 1939 and 1941, the Smoke Commissioner of the City of St. Louis, because of complaints received in his office, was prompted to conduct an investigation in the neighborhood, and not only detected the presence of sulphur fumes in the air as well as a white mist or vapor which reduced visibility to a matter of feet, but also traced such fumes and mist to their point of origin, which he found to be defendant's plant.

But whatever may have been the difficulty encountered during the period before the war when defendant was merely engaged in the manufacture of 93% sulphuric acid in connection with its regular peacetime activities, the situation was in any event greatly aggravated and intensified in the latter part of 1941 when one of the units was converted to the manufacture of 40% oleum at the direction of the Ordnance Department of the United States Army. It appears that oleum is indispensable in the manufacture of T.N.T. for use as ammunition; and the purpose of the Ordnance Department in directing the conversion of defendant's plant was to supply oleum to the Weldon Springs Ordnance Works near St. Louis, which was owned by the United States Government, but was operated by the Atlas Powder Company under Government supervision.

The direction for the conversion of defendant's plant was made under the authority of an act for the conscription of industry, which was enacted by the Congress in 1940. 50 U. S. C. A. App., sec. 309.

Suffice it to say that by the provisions of such act, the President was empowered, through the War and Navy Departments, to place an order with any manufacturer for such product or material as might be required, and which was of the nature and kind usually produced or capable of being produced by such manufacturer. Compliance with all such orders for products or material was made obligatory upon

the manufacturer, and the orders were required to be given precedence over all other orders and contracts theretofore placed with the manufacturer. In the event of the refusal of any manufacturer to comply with any such order, the President, through the War and Navy Departments, was authorized to take over the operation of the plant for the Government; and it was further provided that any corporation or its responsible officers who should fail to comply with the provisions of the act should be deemed guilty of a felony, and upon conviction should be punished by imprisonment for not more than three years and a fine not exceeding $50,000.

Oleum, which is sometimes referred to as fuming sulphuric acid, is made by dissolving sulphur trioxide in concentrated sulphuric acid. Its strength is expressed by the percentage of sulphur trioxide going into the mixture. In other words, 40% oleum represents a mixture of 60% sulphur dioxide and 40% sulphur trioxide. It is a highly unstable product, and one difficult to manufacture. Before the war emergency it had only been manufactured in very limited quantities; and in undertaking to carry out the direction of the Ordnance Department, not only had defendant never made oleum at any time, but it had no experience to guide it derived from any prior instance where a plant constructed for the manufacture of sulphuric acid was converted into a plant for the manufacture of oleum. As might have been expected, serious difficulties were encountered from the very outset. Moreover there was no opportunity for shutting down the plant while awaiting favorable atmospheric conditions and wind direction as in the case of the manufacture of sulphuric acid during peacetime. The amount of oleum furnished the Weldon Springs Ordnance Works determined how much T.N.T. could be made available for the progress of the war, and all during the duration of the war defendant was under constant pressure from the Ordnance Department to increase its output. The result of all this was that the discharge of fumes was greatly intensified over what had been the situation before the manufacture of oleum was begun.

As we have already pointed out, the action was based upon the theory of defendant's alleged negligence, and the pleadings present an unusual situation with respect to the joinder of issue upon that question.

The gist of plaintiffs' cause of action was embodied in paragraph 4 of their petition, in which they charged that defendant then and for some years past had "negligently and carelessly" caused large quantities of poisonous and deleterious gases, fumes, and chemical particles, including concentrated sulphuric acid and oleum, to be discharged from a number of very tall stacks at its plant, and that whenever the wind blew from the direction of the stacks towards plaintiffs' home, it caused such gases, fumes, and chemical particles to be de-

posited in plaintiffs' neighborhood, resulting in injury to their persons and damage to their property.

Defendant went to trial upon an amended answer in which it made specific reference to each of the separately numbered paragraphs in plaintiffs' petition; and when it came to the paragraph in question, it answered as follows: "Defendant admits paragraph 4 of plaintiffs' petition."

Standing alone, such an answer would seem to have amounted to a judicial admission foreclosing any inquiry into the question of negligence. Ordinarily a judicial admission is conclusive so as to remove the matter admitted from the field of disputed issues and bar the party making the admission from thereafter disputing it or taking a position inconsistent with it. However there is at the same time an established rule of appellate practice which holds the parties to adherence to the theory pursued below, and which requires that if a particular construction has been placed upon the pleadings in the lower court, the same construction be given them on appeal. In other words, when a pleading is read from end to end, if there is room for any reasonable doubt regarding its construction, the construction which both parties gave it at the trial will be taken to be the proper one; and an appellate court will not assume that a particular allegation was admitted if the trial proceeded on the theory that such allegation was in dispute. Harwood v. Toms, 130 Mo. 225, 241, 32 S. W. 666; Long v. Lackawanna Coal & Iron Co., 233 Mo. 713, 731, 136 S. W. 673; Clardy v. Kansas City Public Service Co., 227 Mo. App. 749, 42 S. W. (2d) 370; 4 C. J. S., Appeal and Error, sec. 241d. (1) (3).

While it is true that the answer in the case at bar admitted paragraph 4 of the petition, it expressly denied paragraphs 5, 6, 7, 9, and 10 in which plaintiffs particularized as to the injury and damage they had received to their persons and property as the result of defendant's alleged carelessness and negligence in permitting gases, fumes, and acids to escape from its plant and permeate the neighborhood in which they lived. Throughout the trial counsel emphasized on repeated occasions that the issue was one of negligence; and in the submission of the case both sides requested and received instructions upon such theory. There can be no doubt that the parties themselves, as well as the lower court, construed the pleadings as putting negligence in issue, and they will therefore be given the same construction in disposing of the case on this appeal.

By the time of the submission of the case, this issue had been reduced to the question of whether defendant could have remedied or prevented the escape of fumes and gases from its plant, but negligently failed to do so.

The question involved the use of a device or principle known as the Cottrell Precipitator, which is designed to take the foul ma-

terials out of a gas stream by inducting a high voltage electrical current into the stream and thereby causing the foul materials to be precipitated. While a very limited number of organizations in this country and in Europe had designed and manufactured units for the application of the Cottrell process, the same seems to have been handled primarily by the Research Corporation of America, which was founded in 1912 and awarded certain territorial rights by the Smithsonian Institute with the stipulation that any profits derived from the development of the process should go back into scientific research.

It seems to be unquestioned that owing to the higher strength of the materials employed as well as the difference in temperature at which the process is required to be carried on, the manufacture of oleum results in the giving off of far larger amounts of fumes and gases than in the case of the manufacture of sulphuric acid. Not only is the production of fumes and gases inherent in the very nature of the process, but there is no known way of preventing it.

When defendant converted its plant to the manufacture of oleum, it did not know what to expect in the way of fumes and gases, but the result was beyond its worst foreboding. Immediate efforts were made by defendant's own officials to study the problem and find its reason and solution, and the matter was taken up with the Monsanto Chemical Works to see if some way could be devised to reduce the amount of fumes and gases that were being produced. Consultation was also had with many other concerns throughout the country that might have been expected to have knowledge of methods or equipment that would have remedied the situation, and while their recommendations may have helped the condition to some extent, they did not succeed in eliminating the fumes.

Early in 1942 the question of the application of the Cottrell process was taken up with the Research Corporation of America. It was known that Cottrell Precipitators had been used successfully in other classes of sulphuric acid plants for various purposes, and it was thought that the process was worthy of a trial, though the same had never before been employed in a plant converted to the manufacture of oleum. The whole venture was one in virgin territory, and the engineers of the Research Corporation of America did not themselves know whether the process could be made to remedy the situation which obtained in defendant's plant. As a matter of fact, while the scientific principle was well understood, the device to be used in any particular plant was not something already made up that could be ordered and installed. On the contrary, all the evidence, including that for plaintiffs, disclosed that the application of the Cottrell principle to any particular situation requires testing and experimentation, and that in each and every instance it has to be what some of the witnesses referred to as a tailor-made job.

In the summer of 1943 a test plant was constructed upon defendant's premises according to specifications furnished by the Research Corporation of America. The evidence showed that the test plant was required because of the fact that the Research Corporation of America had had no previous experience in designing equipment for a plant of the type and nature of defendant's plant. Among other things, it was necessary to ascertain how rapidly the gas could be drawn out, and how long it would have to be subjected to the electrical flow in order to bring about its precipitation.

The test plant started in operation on September 1, 1943, and continued in operation throughout the months of September and October. In November, 1943, the Research Corporation of America, acting upon the results obtained in the operation of the test plant, submitted several tentative proposals of what might be installed to remedy the situation. On January 14, 1944, defendant was instructed by the Ordnance Department to discontinue the manufacture of oleum, and negotiations with the Research Corporation of America for the installation of a Cottrell Precipitator were thereupon abandoned. However, in October, 1944, defendant was directed to resume the manufacture of oleum, and negotiations for the installation of a Cottrell Precipitator were once again begun. On V-J Day, which was August 15, 1945, the manufacture of oleum was finally terminated. Some time later a Cottrell Precipitator was completed and installed; and while defendant's assistant superintendent testified in his direct examination that it had accomplished the desired purpose of eliminating the fumes in the manufacture of sulphuric acid, it was brought out in his cross-examination that there was still a certain amount of gas and mist coming out of the stacks at the time of the trial in May, 1946.

The chief controversy on this appeal is over the question of whether plaintiffs made a case for the jury as against defendant's motion for a directed verdict at the close of all the evidence.

Plaintiffs' petition charged mere general negligence, that is, that defendant carelessly and negligently caused gases, fumes, and chemical particles to be emitted from its plant and deposited in plaintiffs' neighborhood.

In their brief in this court plaintiffs argue that their case was one for the application of the doctrine of res ipsa loquitur. It is clear, however, that they are wrong in such assumption. One of the essentials of a res ipsa loquitur case is that the happening complained of be such as in the ordinary course of things does not occur if proper care is exercised by those having the management or control of the instrumentality producing the injury. [Pandjiris v. Oliver Cadillac Co., 339 Mo. 711, 98 S. W. (2d) 969; Brown v. St. Louis County Gas Co., Mo. App., 131 S. W. (2d) 354.] In this case the evidence showed that the giving off of fumes and gases is inherent in the manufacture

of sulphuric acid and oleum. In fact, oleum is known as fuming sulphuric acid. The mere circumstance of the giving off of fumes and gases may therefore not be said to bespeak negligence, or, in other words, to afford reasonable evidence, in and of itself, that such a consequence was attributable to the lack of proper care.

But while referring to the case as one of res ipsa loquitur, what plaintiffs doubtless mean to urge is that it comes within the principle of Fletcher v. Rylands, L. R. 1 Exch. 265, L. R. 3 H. L. 330, which is that one, who for his own purposes collects and keeps anything upon his land which is likely to do mischief if it escapes, must keep it at his peril, and if he does not do so is prima facie liable for all the damage which is the natural consequence of its escape. In any event, the petition was drawn upon this theory. It is enough to say, however, that such principle has been seriously questioned in practically all jurisdictions, and at any rate is not the law in our own jurisdiction, where it is held the liability cannot be imposed upon the owner or occupant for damage caused by the escape of substances from his premises except upon proof of some fault or negligence on his part. [Murphy v. Gillum, 73 Mo. App. 487; Greene v. Spinning, Mo. App., 48 S. W. (2d) 51; Griffith v. Lewis, 17 Mo. App. 605; McCord Rubber Co. v. St. Joseph Water Co., 181 Mo. 678, 81 S. W. 189.]

It is interesting to note that while plaintiffs drew their petition upon the principle announced in Fletcher v. Rylands, and while they presented their evidence upon that theory, when they came to the submission of the case they abandoned their reliance upon the mere fact of the escape of the fumes and gases, and included the element of whether defendant had permitted such fumes and gases to escape, when, in the exercise of ordinary care, it could have remedied or prevented said condition, but failed to do so. Such specific element of liability was undoubtedly suggested by the evidence regarding the eventual designing and installation of a Cottrell Precipitator; and the obvious purpose of the instruction was to submit the question of whether defendant had been guilty of negligence in failing to prevent the escape of fumes and gases by at all times making use of such a device.

Having due regard for the fundamental concepts of the law of negligence, we cannot escape the conclusion that plaintiffs failed to make a case for the jury upon this issue.

As a matter of fact, plaintiffs practically concede that they made no case of any sort by their own evidence, unless the doctrine of Fletcher v. Rylands is to be given effect. They insist, however, that a case was nevertheless made on defendant's evidence, which showed that the Cottrell principle was not only applicable to defendant's plant, but also that when a Cottrell Precipitator was finally designed and installed, it successfully eliminated the fumes and gases.

The trouble with this contention is that it disregards the absence from the case of certain essential elements whose existence must appear in order to give rise to actionable negligence.

There is a distinction to be drawn between negligence and actionable negligence. [Hight v. American Bakery Co., 168 Mo. App. 431, 151 S. W. 776.] Even though a given act or omission might be thought to indicate a lack of care and thus to constitute negligence from the viewpoint of the ordinary layman, it does not follow that a cause of action will inevitably arise therefrom. On the contrary, in order to impose liability there must not only be a lack of care, but such lack of care must involve a breach of some duty owed to another under the particular circumstances existing at the time of the act or omission complained of, which act or omission must have proximately resulted in such other person's injury.

The question of whether defendant was guilty of negligence in failing to install a Cottrell Precipitator so as to prevent the escape of fumes and gases is not unlike that which arises where a defendant is called upon to answer for its nonobservance of a statutory duty to place a guard upon a dangerous machine. Such a duty is absolute whenever it is possible for the machine to be guarded; and if, in such a case, it appears that there was a guard or safety device known and obtainable which would have served the purpose contemplated by the statute, the failure of the defendant to guard its machine with such device will in that event give rise to actionable negligence. [Simon v. St. Louis Brass Mfg. Co., 298 Mo. 70, 250 S. W. 74.] On the other hand, if there is no such device known and obtainable, the defendant cannot be held guilty of negligence in failing to install it.

As regards the question of defendant's liability in the case at bar, we have already pointed out that while the Cottrell principle was known and understood in scientific circles, the device to be used in any particular plant was not something available on the market that could be ordered and installed. Instead, the application of the principle to any given situation required testing and experimentation; and when the Research Corporation of America was engaged to make tests in defendant's plant, its own engineers assigned to the project did not know whether their efforts would meet with success. It is true that after a long process of trial and error, a device was designed which succeeded in eliminating the fumes and gases. However the fact that it ultimately proved possible to adapt the Cottrell principle to defendant's plant does not mean that defendant was guilty of actionable negligence in having previously operated its plant without the benefit of such device. It may be that defendant was in one sense negligent in so long delaying its experimentation with the Cottrell principle, but such negligence, if any, lacked the essential elements to make it actionable in this character of proceeding. If a

Cottrell Precipitator had been readily procurable on the market, defendant would no doubt have owed plaintiffs the duty of promptly installing one, but since such a device was not available on the market, defendant was not guilty of any breach of duty so as to have afforded plaintiffs a remedy by an action for negligence.

The whole trouble is that while plaintiffs may have a cause of action, they have mistaken the remedy to be pursued for its enforcement. If they are to obtain redress for whatever injury and damage they have sustained, it seems clear that it must be upon the theory of nuisance. It is well recognized that for one to permit fumes and gases to escape from his premises and be deposited on the premises of another to his injury and damage may constitute an actionable wrong in the maintenance of a nuisance. [Bradbury Marble Co. v. The Laclede Gaslight Co., 128 Mo. App. 96, 106 S. W. 594; Powell v. Brookfield Pressed Brick and Tile Mfg. Co., 104 Mo. App. 713, 78 S. W. 646; Lederer v. Carney, Mo. App., 142 S. W. (2d) 1085.] What is of course meant is that such a condition may constitute a nuisance in fact, depending on the circumstances of the particular case, such as the location and character of the neighborhood; the nature of the use to which the property is put; the extent and frequency of the injury; and the effect upon the enjoyment of life, health, property, and the like. Schott v. Appleton Brewery Co., Mo. App., 205 S. W. (2d) 917; Bradbury Marble Co. v. The Laclede Gaslight Co., *supra*; Powell v. Brookfield Pressed Brick and Tile Mfg. Co., *supra*. The doctrine is not limited to any particular character of industry, and it has been expressly held that the emission of fumes and gases from a sulphuric acid plant may constitute a nuisance, although the business itself is not unlawful, nor is the plant a nuisance *per se*. [Holman v. Mineral Point Zinc Co., 135 Wis. 132, 115 N. W. 327; Susquehanna Fertilizer Co. v. Malone, 73 Md. 268, 20 A. 900; 46 C. J. 725; 39 Am. Jur., Nuisances, sec. 58.]

Plaintiffs' difficulty in the case at bar has been in attempting to make the facts fit a legal theory which they were insufficient to sustain, and particularly so with respect to the endeavor to predicate actionable negligence upon defendant's failure to have prevented the escape of fumes and gases by the use of a Cottrell Precipitator. While the evidence with respect to the designing and installation of a Cottrell Precipitator would have been material on the question of the abatement of a nuisance, it did not establish actionable negligence. But notwithstanding the relevancy of any of the evidence to the questions that would arise in the case of nuisance, plaintiffs appreciate that a petition based on the theory of negligence will not sustain a recovery on the theory of nuisance. [Pearson v. Kansas City, 331 Mo. 885, 55 S. W. (2d) 485; Bollinger v. Mungle, Mo. App., 175 S. W. (2d) 912.]

It has been repeatedly held that where it appears from the record that the plaintiff has rights growing out of an occurrence but has misconceived his remedy, it is within the province of an appellate court to remand the case to permit the petition to be amended, if the plaintiff is so advised, and the case retried upon the cause of action disclosed. [Doty v. American Nat. Ins. Co., 350 Mo. 198, 165 S. W. (2d) 862; Jensen v. Wilson Tp., Gentry County, 346 Mo. 1199, 145 S. W. (2d) 372; Patzman v. Howey, 340 Mo. 11, 100 S. W. (2d) 851.]

It follows from what has been said that the judgment of the circuit court should be reversed and the cause remanded for a new trial except as to the issues arising on plaintiff Florence L. Kelley's claim for damages for her own personal injuries. The jury has found against her upon that issue, and she has not appealed. The verdict of the jury upon that phase of the case should therefore be retained and held in abeyance until all the remaining issues are determined, whereupon final judgment shall be entered disposing of the whole case and all the parties. The Commissioner so recommends.

PER CURIAM:—The foregoing opinion of BENNICK, C., is adopted as the opinion of the court.

The judgment of the circuit court is, accordingly, reversed and the cause remanded in accordance with the recommendations of the Commissioner. *McCullen, P. J.*, and *Anderson* and *Hughes, JJ.*, concur.