Glyndon R. DIVELBISS et al.,
Respondents,

v.

PHILLIPS PETROLEUM COMPANY,
a corporation, Appellant.

No. 22065.

Kansas City Court of Appeals.

Missouri.

Oct. 4, 1954.

Rayburn L. Foster, Harry D. Turner, Bartlesville, Okl., H. H. Booth, Warren R. Anderson, Kansas City, Gayles R. Pine, Warrensburg, for appellant.

Will H. Hargus, C. E. Groh, Harrisonville, Roy Jones, Warrensburg, for respondents.

BROADDUS, Judge.

This action is one for damages to a dairy herd. It was instituted in the Circuit Court of Cass County on December 20, 1950. Upon defendant's application for a change of

venue the cause was transferred to Johnson County where a trial was had on July 20, 1953, resulting in a verdict and judgment for plaintiffs in the sum of $3,000. Defendant has appealed.

Plaintiffs, Glyndon R. Divelbiss and his son, Glyndon, Jr., are engaged in dairying and farming. They lease a farm of approximately 160 acres located about a mile and one-half northeast of Harrisonville in Cass County. This farm is located just across an east-west road from defendant's pipe line station; the farm being on the north side of the road, and defendant's station on the south. There is a branch running across plaintiffs' pasture.

During 1950 plaintiffs were milking a herd of 26 cows.

On November 9, 1950, Mr. Divelbiss, Sr., noticed the odor of gasoline and fuel oil on the cows when they came to the barn. And, on the following morning, "They came in stamping and kicking, something was burning their legs, and we could smell fuel oil and gas on them." He went down in the pasture and saw fuel oil and gasoline in the creek. On the morning of November 11th some of the cows were sick and two died that day. He called Dr. Dicke, a veterinarian, who came twice, November 13th and 14th, to examine the herd. Dr. Dicke treated three of the cows on the first visit. He testified: "They were quite severely sick, and I didn't expect them to live. There were eight or ten others that showed evidence of having consumed a considerable amount—I couldn't tell whether it was kerosene or gasoline, some oil. They definitely had consumed kerosene or gasoline or diesel oil or something of that nature"; that "volatile oil poisoning" had caused the death of two of the cows and sickness of the others; that such poisoning "damages the kidneys and liver and central nervous system, causes abortions and causes gastrointestinitis and will dry cows up in lactation."

On November 18, 1950, Mr. Divelbiss, Sr., and five of his neighbors, who were also farmers, went to plaintiffs' pasture.

They saw dead frogs and minnows in the branch. They dipped water from the branch at several locations. Part of the sample taken was poured out on the ground and ignited. Mr. Divelbiss and these neighbors testified that they traced the oil and gasoline to a pipe coming out from defendant's pumping station and emptying into an open ditch, which connected with the branch running across plaintiffs' pasture.

These neighbors observed the herd during the months following November, 1950. One of them, Mr. Helmick, testified that the cows "didn't do a bit of good. They fell down in milk production and several of them dried up." Another, Mr. Fergurson, stated: "They were so thin, some of them could barely get up and their hair was set and they were shot from one end to the other." Another, Mr. Hodges, said: "Their hair looked like it had been singed and they quit giving milk and they lost weight."

The evidence shows that the two cows that died were reasonably worth $350 apiece. Plaintiffs had to sell 13 cows. Three were sold on November 7, 1950, for $118, $215, and $157. Prior to the time they became sick these three cows were valued at $400 to $450 each. On December 19, 1950, one cow which had been worth $450 was sold for $236. The remaining cows were sold during the months of May, September and December, 1951. The one sold in May brought $200 and had been worth $400. The other cows brought $100, $205, $261, $269, two at $238, $98, $138, and $179. They were worth from $350 to $450 each prior to the time they became ill.

Defendant offered no evidence.

Defendant's first point is that the court erred in overruling its motion for a directed verdict. It says plaintiffs "utterly failed to allege or prove any facts which constitute maintenance of a nuisance by defendant or any facts which constitute negligence on the part of the defendant in the operation and maintenance of its pumping station."

In paragraphs 1 and 2 of their petition plaintiffs alleged that defendant operated a pipe line pumping station on its premises; that plaintiffs' cows were kept in a pasture north of and across the road from said pumping station and that there was a small branch running across the road and through the pasture.

Paragraph 3 of said petition is as follows:

"Plaintiffs further state that during the month of November, 1950, the defendant wrongfully and unlawfully caused and permitted gasoline, oil, waste, sewage, and petroleum products to be discharged from defendant's said pumping station, and premises into the said branch and, as a result thereof, the water in said branch became polluted and contaminated; that such polluted and contaminated water flowed in the said branch and into the said pasture; that plaintiffs' said cows drank the said polluted water and, as a direct result thereof said cows became ill."

■ It is apparent from plaintiffs' petition that the charge therein is not one of negligence in permitting gas and petroleum products to escape from defendant's pumping station and premises. The charge is that defendant wrongfully and unlawfully caused and permitted such products to be discharged from said pumping station into a small branch running from across the road where said pumping station is located and through plaintiffs' pasture. In our opinion, under the following authorities, the petition stated a cause of action based upon the theory of the maintenance of a nuisance.

In the case of Haynor v. Excelsior Springs Light, Power, Heat & Water Co., 129 Mo.App. 691, 108 S.W. 580, 582, plaintiff brought suit for damages alleged to have been caused by oil or grease which defendant had permitted to escape into and mingle with the waters and into the bed of a certain stream from which such oil or grease entered the well of plaintiff situated on premises adjoining defendant's gas manufacturing establishment. It was further alleged in the petition that the defend-ant negligently or willfully permitted such substance, oil or grease, to flow into and mingle with the waters of said stream. Defendant in its evidence did not deny that it used the stream to carry off the refuse of its plant. There was a judgment for plaintiff. Concerning the nature of plaintiff's action this court stated:

"We do not agree with defendant's view that the omission from the hypothesis of plaintiff's instructions 1 and 5 of the issue of defendant's negligence constitutes error. It is true, plaintiff alleges in her petition that defendant negligently turned the injurious substance into the watercourse, but that averment was immaterial to her cause of action and should be regarded as surplusage. The gravamen of the action is not negligence, but the establishment and maintenance of a nuisance."

In the same case we further said:

"Plaintiff's cause of action arose from the fact that defendant used the watercourse as a sewer, and that she sustained an injury to her property rights in consequence thereof (Citing cases). In Casey v. [Wrought Iron] Bridge Co., 114 Mo.App. [47] loc. cit. 61, 89 S.W. 330, we said: 'There is a marked distinction, though sometimes ignored, between causes of action based upon nuisance, and those grounded in negligence (Citing cases). In the former class the fact of negligence is not an essential element, for the reason that a thing is a nuisance when of itself it constitutes an unlawful annoyance or a source of danger to others, and the author of it or the one who maintains it is held liable regardless of the degree of care exercised by him. His liability is of the character of an insurer.' This assignment must be ruled against the contention of defendant."

In Powell v. Brookfield Pressed Brick & Tile Manufacturing Co., 104 Mo.App. 713, 78 S.W. 646, 647, plaintiffs sued for damages to their corn crop caused by smoke, vapors and fumes escaping from the fires

and furnaces of defendant's brick plant. The words "carelessly" and "negligently" were stricken out of the petition by amendment and the word "unlawfully" was left therein so that the petition alleged that defendant unlawfully permitted smoke, vapors and fumes to escape. Judgment for plaintiff was affirmed and this court stated:

"An actionable nuisance is anything wrongfully done or permitted which injures another in the enjoyment of his legal rights (Citing authorities). The test of nuisance is not injury and damage, simply, but injury and damage resulting from the violation of the legal right of another."

In the case of Kelley v. National Lead Co., 240 Mo.App. 47, 210 S.W.2d 728, 735, cited by defendant, suit was brought upon the theory of negligence of the defendant in permitting gases, fumes, and chemical particles to be emitted from its chemical plant. The court held that negligence had not been proved and then used this language:

"The whole trouble is that while plaintiffs may have a cause of action, they have mistaken the remedy to be pursued for its enforcement. If they are to obtain redress for whatever injury and damage they have sustained, it seems clear that it must be upon the theory of nuisance. It is well recognized that for one to permit fumes and gases to escape from his premises and be deposited on the premises of another to his injury and damage may constitute an actionable wrong in the maintenance of a nuisance. Bradbury Marble Co. v. Laclede Gaslight Co., 128 Mo.App. 96, 106 S.W. 594; Powell v. Brookfield Pressed Brick & Tile Mfg. Co., 104 Mo.App. 713, 78 S.W. 646; Lederer v. Carney, Mo.App., 142 S.W.2d 1085."

The judgment in that case was not reversed outright, but the cause was remanded to permit the petition to be amended, if plaintiff so desired, and the case retried upon the cause of action disclosed.

We have examined the cases cited by defendant, some of which were brought upon the theory of negligence. All of them, however, can be readily distinguished from the case at bar.

■ We also take the view that under the evidence in the instant case, which we have heretofore set out, plaintiffs made a submissible case upon the theory of nuisance.

Defendant's next point deals with Instruction No. 1 given on behalf of plaintiffs. Defendant makes two attacks on this instruction; the first being that it did not require a finding of negligence. What we have said above disposes of this contention adversely to defendant.

■ Defendant's second criticism of the instruction is that it did not require the jury to find the existence of a nuisance. In answer to a similar contention the court in Clark v. City of Springfield, Mo.App., 241 S.W.2d 100, 107, said:

"Further objection is made to Instruction No. 1 because it did not state that the acts complained of constituted a nuisance. *It was the jury's duty to pass upon the facts. Whether or not the facts they found constituted a nuisance was a question of law,* Pearson v. Kansas City, 331 Mo. 885, 55 S.W.2d 485; Smiths v. McConathy, 11 Mo. 517, and it was entirely without the jury's province to pass upon that question. Whether a nuisance existed depends upon the facts pleaded, proved and instructed upon and not upon a conclusion born from the use of the word. Martin v. City of St. Joseph, 136 Mo.App. 316, 117 S.W. 94." (Emphasis ours.)

■ Defendant also contends that the court erred in giving plaintiffs' Instruction No. 2 defining negligence. The instruction defines the terms negligent and negligence "as used in these instructions." No other instruction contained the word "negligent" or "negligence". Hence, there was no instruction to which the definition could apply. And, as we have hereinbefore pointed out, it was not necessary for plaintiffs to prove negligence. The instruction was inadvertently given. However, we do not think that under the circumstances the error was

prejudicial to defendant. It is not shown that the giving of the instruction could have affected the merits of the case. Appellate courts are precluded from reversing a judgment unless error was committed against the appellant materially affecting the merits of the action. Section 512.160 RSMo 1949, V.A.M.S.

Defendant's next point is that: "The giving of plaintiffs' Damage Instruction, No. 5, is reversible error for the reason that it was confusing, misleading and improperly assumed elements of damage not within the pleadings or evidence."

■■ The first element of damages in the instruction is for the reasonable value at the time of death of any cows that may have died as a result of sickness caused by drinking polluted water. The measure of damages for killing animals is the value at the place where and when the animals were killed. Shahan v. Lusk, Mo.App., 190 S.W. 43, 44. This rule has been applied where the death of the animals was caused by disease. 3 C.J.S., Animals, § 58, page 1178. There was substantial evidence to support this element of damages. Two of plaintiffs' cows died on November 11, 1950. The cause of their death was volatile oil poisoning, and the evidence disclosed their value to be $700. The second element is for the reasonable value at the time of loss of milk, if any, contaminated up to December 20, 1950 (the date of the filing of the petition). This item also found support in the evidence. On the evening of November 10th the odor of fuel oil was detected in the milk and as a result one milking, valued in excess of $10, was found to be unfit for use and had to be dumped.

The third element is for the reasonable value of profits, if any, lost from lowered milk production to December 20, 1950. Lowered milk production would necessarily result in loss of profits from a herd of dairy cows. Plaintiff Glyndon R. Divelbiss, Sr., has been in the dairy business for thirty years. He testified the cows "cut down in production, they wouldn't eat, and some of them seemed to dry up in their milk." And, referring to the three cows which were sold on December 7, 1950, he stated: "They got to where they wouldn't produce and were going down and getting poor. The feed I gave them didn't do any good; and they were practically dry as far as milk production" was concerned.

In the case of Sinclair v. Columbia Telephone Co., Mo.App., 195 S.W. 558, this court held that plaintiff in an action for personal injury could recover damages for loss of profits in his business of dealing in livestock and that evidence of average annual profits prior to his injury was admissible. According to that case the only question is whether the evidence in behalf of plaintiff as to loss of profits shows such loss with "reasonable certainty."

Plaintiffs introduced tickets showing sales of milk during the months of November and December, 1950. They also introduced sales tickets covering the preceding and subsequent months. The loss shown during the period between November 10 and December 20, 1950, was $200.47. In this connection it should also be pointed out that plaintiffs' cost of feed ran from $50 to $65 per month more after the cows became ill. In our opinion there was substantial evidence to support a finding with *reasonable certainty* of loss of profits from lowered milk production.

The fourth element of damages pertains to depreciation in the reasonable value of cows as a result of drinking contaminated or polluted water. Plaintiffs sold on the market thirteen cows which had been ill from volatile oil poisoning and were unfit for use as dairy cows. Prior to the time they became ill these cows under all the testimony were worth from $350 to $450 apiece. One of plaintiffs' neighbors hauled the cows to market. He testified "they were thin, didn't have any flesh, hair was on end and they sold as consumer cows." The total minimum loss from depreciation on these cows amounted to $2,293.78.

We find no prejudicial error in the instruction.

■ There is likewise no merit in defendant's assertion that there was no evi-

dence that the cows were in good condition and not diseased prior to drinking polluted water.

The total amount of minimum damages established by the evidence amounted to $3,204.44. This refutes defendant's last assignment that the verdict was excessive.

Finding no error prejudicial to defendant the judgment is affirmed. All concur.