**Mildred EDDY, Respondent,**

v.

**MISSOURI PUBLIC SERVICE COMPANY,**
**a corporation, Appellant.**

**No. 22590.**

Kansas City Court of Appeals.

Missouri.

Jan. 6, 1958.

**6**

F. L. Thompson, E. E. (Tom) Thompson, Sam Mandell, Popham, Thompson, Popham, Mandell & Trusty, Kansas City, W. T. Bellamy, W. T. Bellamy, Jr., Marshall, for appellant.

Robert D. Johnson, Herbert F. Butterfield, Johnson & Butterfield, Marshall, for respondent.

HUNTER, Judge.

This is an appeal by defendant, Missouri Public Service Company, from a judgment entered on a jury verdict for plaintiff, Mildred Eddy, in the sum of $500 for personal injuries allegedly resulting from her inhalation of a natural gas odorizer negligently permitted by defendant to saturate the air where she was working.

Defendant utility distributes natural gas in the City of Marshall, Missouri. This natural gas, purchased by it from the pipelines of Cities Service Pipeline Company, has no odor, and its presence cannot be discovered by sight, smell or taste. According to the evidence, defendant is required by law as a safety measure to add to this natural gas an odorizer so as to make its detection possible if it should escape through pipe leaks or otherwise. The odorizer used by the utility was made by the Natural Gas Odorizing Company of Texas. According to the uncontroverted testimony of its chemical engineer, this odorizer, known as captan, consists of approximately 53 per cent captan, which is a petroleum product something like gasoline, 34 per cent sulphur and about 11 per cent hydrogen, all bound up in a molecule. The product has a very distinctive odor, and one gallon of it will properly odorize one million cubic feet of natural gas. Defendant maintains a border station at the west edge of Marshall where the gas is taken from the larger pipeline to the smaller feeder lines that go into the City to defendant's customers. It is at this station that defendant maintains underground a 30-gallon tank to hold the captan which as a result of a mechanical arrangement is mixed with the natural gas that goes on to these customers. There is a small "filler pipe" running from several feet above ground directly into this 30-gallon tank. When defendant wishes to refill the captan tank as is necessary about three times a year, one of its employees pours the captan from a 5-gallon container into the filler pipe with the aid of a funnel.

James Martin, gas foreman of defendant utility company, testified that on July 7, 1954, he undertook to replenish the captan tank. Oliver Yates, a fellow employee, was with him. Martin first unloosened the cap on the steel container of the captan. He poured the captan into a 5-gallon container. He then unloosened the cap on top of the filler pipe, and with the aid of a funnel proceeded in this manner to pour a total of ten gallons of captan through the filler pipe into the 30-gallon underground captan tank. The entire process took between fifteen and twenty minutes. During that time the captan being poured was exposed to the air. He was asked if any was spilled there that morning and answered, "Oh, there might have been two or three drops, something like that," and that he was "awfully careful."

According to other evidence, on this same morning captan odor was very noticeable to many persons in the central section of Marshall. Wind from the southeast was bringing the odor from the border station to the town. John Hughes, news editor of a Marshall Radio station, while on the street outside the courthouse in Marshall smelled this odor of gas (captan) and "thought perhaps there would be a story in it, in that a gas main had broken, and * * * checked it with Turner (defendant's manager). Mr. Turner told me that there was no trouble whatsoever, outside of the fact that in putting in this chemical, captan, in the tank south of town, or west of town—west of town, some of it had spilled over." Doris Blackerby, employed by defendant was asked,

"Could you smell it very plainly and easily up on the square (of Marshall) here? A. Yes, I would say so." Mrs. Edwin Smith, a witness for defendant, testified that on the morning in question she smelled the odor of gas all through the house, and also outside. She called out several of her neighbors who also smelled it. She called defendant utility company to report what she thought might be a leak. She had lived in the same place thirteen years. She couldn't remember if she had smelled it on previous occasions but if she did, "it wasn't anything like that." "Q. And it was particularly strong, was it not? A. Yes. Q. It permeated your house? A. Well, I could smell it all through the house."

On this same morning plaintiff, age forty, was doing her customary work of grading eggs at the Phillips Poultry Company plant in Marshall. This plant was located 5,029 feet to the east and north of the border station. She and another employee, Mrs. Stolberg, were working in a room about 50 to 55 feet long, north and south, 8 to 10 feet wide with an 8 or 10 foot ceiling. The room was kept dark and the doors closed to aid in the work being done. It had only two windows. One, on the north wall, was occupied with a 3-foot intake fan which pulled air from the outside through a small water mixture into the room. The other window, toward the south, permitted the cool air to go on to another worker located in another room.

Plaintiff testified in substance as follows: Commencing at 8:00 a. m. she was working in the center of three spaces provided for workers. It was a very hot day. There was a small fan on the table northeast of her blowing toward her and directly in her face, and another fan on the floor between her and Mrs. Stolberg. about 10:00 a. m. plaintiff and Mrs. Stolberg both smelled the odor of captan. According to plaintiff the odor seemed to be coming from the outside, drawn in by the large window intake fan. She immediately got a severe headache, sick at

her stomach, dizziness, couldn't see straight, had difficulty in breathing, broke out in a cold sweat, was awfully hot, and it seemed like her arms wouldn't work, and that she was getting numb. She was assisted to the office and placed on a cot. According to Ted Phillips, plaintiff's employer, who then went into the grading room, it did smell like gas there, and the gas office was called and a man came out and didn't find any gas leaks. The odor seemed just as severe to plaintiff even outside her work room. It was all over the plant. Dr. Lawrence was called. On arrival, he sent her to Fitzgibbon Hospital. While there she experienced difficulty in breathing, her chest hurt, she had severe headaches, and was very nervous, had numbness in her legs and arms and her back hurt. The first day she was given oxygen. She remained in the hospital five days. She was off from her work four or five weeks. She still has nervousness, headaches, sinus trouble, some numbness in her legs and trouble in her back. Other than a little prior nervousness she had never had any of these complaints before she "had that gas". The hospital records for July 7, 1954, stated: " * * * patient was brought to hospital, nausea and vomiting; weakness and perspiring and feeling quite sick * * *." She testified she had a little nervousness prior to July 7, 1954, but no other trouble before that. She had a hysterectomy five years ago and was operated on for a thyroid cyst in April, 1954. She had a repair operation prior to the hysterectomy and in July, 1955, was confined in the hospital for thirty-two days for sciatica and was given traction.

Plaintiff's witness and physician, Dr. Lawrence, who examined her shortly after she became ill at her place of employment found "her pulse fast and she was perspiring and very cold." " * * * From the history she gave, she told me she inhaled some gas from a fan—I mean an exhaust fan of some type. From the history she gave—I can't identify the gas—but from the history she gave I felt this patient in-

haled some type of gas which I was unable to determine. The results were only temporary. The patient felt badly for a few days. There was some irritation of the chest for several weeks, and as far as I was able to determine from physical examination and x-ray there was no trouble or residue following this episode of July 7th." Later in his testimony he stated that people who are in shock, whether from gas inhalation or injury, become cold and clammy, are short of breath, weak, nervous, perspiring, sick at the stomach, have thready pulse, headache; that plaintiff said she noticed a peculiar odor from the intake fan, and her head began to ache and she noticed dizziness, and became sick at her stomach. When asked on cross-examination to explain how plaintiff could have been made ill and her fellow employee working in the same room the same length of time who was also exposed to the exhaust fan did not become ill, he replied: "Well, everybody is a little different; it might affect me differently than it did you. You might be able to stand a lot, and after you got fresh air you might be able to go on; somebody else might get a whiff and it would make them sick, and for a day or so.

"Q. Wouldn't it be because that particular individual was particularly sensitive? A. It might be possible; everybody is different; everybody is sensitive to one thing or another.

"Q. I believe you doctors call it idiosyncrasies? A. That's right.

"Q. That would be your logical opinion if others were similarly exposed to it and did not become ill? A. Very possible.

"Q. That she had an idiosyncrasy to the particular odor, is that right? A. That's right."

On behalf of defendant, the chemical engineer for the Natural Gas Odorizing Company, who held a degree of Bachelor of Science in chemical engineering, testified that there was no poisonous ingredient or element in the product, and that about twen-

ty employees of the Natural Gas Odorizing Company handled captan, day in and day out, and that he had never heard of anyone becoming ill from captan, although these men worked in a closed room with exhaust fans which had captan vapors in it continuously as they worked. Mrs. Stolberg, defendant's witness, testified she worked in the same room with plaintiff that day, breathing the same air and odor as plaintiff and that it did not cause her to become ill. Mr. Pygman, gas service man for defendant, testified he worked directly over the captan while pouring it from a bucket into the funnel of the filler pipe at the border station and he was never made sick by it. Doris Blackerby, cashier for defendant and plaintiff's witness, testified she smelled the captan in her office in Marshall that day but it did not make her sick or cause injury to her. Mr. Hughes, the news editor, testified it did not affect him in any way when he smelled it outside the courthouse. Defendant's witness, Dr. Callaway, testified that he was familiar with the odor and makeup of captan. Inhalation of its vapors, even at close proximity, could not cause a normal person to be ill or cause any irritation of the throat or lungs or nose. A person may have an idiosyncrasy or allergy to some substance. Captan is not toxic or poisonous in any respect. It does have a strong odor. Captan was written up in Readers Digest as a great thing to treat plants with, and he had sprayed his tomatoes with it the previous summer. It was not poisonous. Eleven other witnesses for defendant testified they had worked with and inhaled the captan odorizer on many occasions without any ill effects.

Defendant's principal contention is that the trial court erred in overruling its motion for a directed verdict at the close of all the evidence, and its motion for a new trial because it owed no duty to plaintiff with respect to its use of the captan odorizer. Defendant's given reason is that all of the evidence showed that the captan fumes and vapors were nonpoisonous, nontoxic, and noninjurious, and that prior to

this occasion no one to their knowledge or to anyone else's knowledge so far as is known had ever been injured or made ill by it, and defendant had no reason to believe that plaintiff or anyone else would be injured by those vapors.

■ In determining whether or not the trial court erred in overruling defendant's motion for a directed verdict at the close of all of the evidence, it is the duty of the appellate court to consider only the evidence most favorable to plaintiff and the reasonable inferences to be drawn therefrom and to disregard the evidence of the defendant unless it aids the plaintiff's case. Sibert v. Boger, Mo.Sup., 260 S.W.2d 569; Tenkhoff v. New York Life Ins. Co., Mo. App., 191 S.W.2d 1005; Stephens v. Kansas City Gas Co., 354 Mo. 835, 191 S.W.2d 601, 605; Miles v. Ozark Bowl, Inc., Mo. App., 250 S.W.2d 849.

■ It is fundamental that to constitute actionable negligence there must exist three essential elements; namely, a duty which the defendant is under to protect the plaintiff from injury; a failure to discharge that duty; and injury resulting from the failure. Without the presence of all three of these elements no liability can result. Davidson v. St. Louis-San Francisco Ry. Co., Mo.Sup., 229 S.W. 786; 65 C.J.S. Negligence § 2, page 324. Broadly stated, the law imposes on every person in the conduct of his affairs the general duty to act with reasonable care and forethought so as not to endanger or harm the person or property of another by any agency set in operation by him. Therefore, if a reasonable person can, by the use or exercise of ordinary care under the circumstances, foresee the probability of effect of a given cause, it is sufficient to fasten liability because what one knows or should know is equivalent in law. Arnold v. May Department Stores Co., 337 Mo. 727, 85 S.W.2d 748; Benton v. City of St. Louis, 248 Mo. 98, 154 S.W. 473. On the other hand, there is no duty imposed by law to guard against something the danger of which is not rea-

sonably foreseeable under the circumstances, for it is equally fundamental in the law of negligence that a person is not required to anticipate or guard against an occurrence which an ordinarily prudent and careful person could not have reasonably anticipated and would not have happened unless under exceptional circumstances. Nelson v. C. Heinz Stove Co., 320 Mo. 655, 8 S.W.2d 918; Mann v. Pulliam, 344 Mo. 543, 127 S.W.2d 426; Pietraschke v. Pollnow, Mo.App., 147 S.W.2d 167. In the law of negligence no duty arises from nor may be predicated on an act or omission for which there was no reason, or no reasonable ground to anticipate that injury of any kind might result. American Brewing Association v. Talbot, 141 Mo. 674, 683, 42 S.W. 679, 682; Kelley v. National Lead Co., 240 Mo.App. 47, 210 S.W.2d 728, 734; Mann v. Pulliam, supra; 65 C.J.S. Negligence § 5(a), page 360.

We move to the more difficult and critical question that lies at the heart of this case, namely, was the defendant under the circumstances disclosed by the evidence and reasonable inferences therefrom favorable to plaintiff under a duty to know or to reasonably foresee that by its acts of exposing the captan to the air in its filling operation and its spilling of a portion thereof that someone, such as this plaintiff, might be injured thereby. Cf. Mann v. Pulliam, supra.

There are few cases in our state concerning the question of duty to foresee in situations concerning allergies (idiosyncrasies). One which has come to our attention touching the subject is Arnold v. May Department Stores Co., supra. In that case the defendant's beauty operator recommended to plaintiff a hair dye called Notox. Plaintiff informed the operator that she had suffered a skin eruption ten years earlier from a hair dye, and, consequently was afraid to use anything but henna. The operator reassured her and applied no test beforehand despite the manufacturer's instructions on the box warning that persons with an idiosyncrasy to skin or scalp dis-

ease should not use any hair coloring. As a result of the application of the hair dye plaintiff suffered severe injuries. Our Supreme Court affirmed recovery on the basis that plaintiff was sensitized or possessed an idiosyncrasy to the dye that defendant knew of or should have known of in view of her statement to the operator of her earlier skin eruption from use of hair dye. The knowledge defendant had was held to put defendant on notice that plaintiff was probably allergic to this product. Thus, where a particular result to a person obtains from past acts or omissions known to defendant he is charged with knowledge that a similar act or omission may produce a similar result. See 65 C.J.S. Negligence § 5(c), page 362.

In Evinger v. Thompson, 364 Mo. 658, 265 S.W.2d 726, plaintiff, a mechanic, sued for injury from dermatitis allegedly caused by contact with a rust inhibitor used in the cooling systems of diesel engines of defendant. Defendant contended plaintiff's condition was not the result of negligence but of his own peculiar sensitivity or allergy, and that even if his condition did not result from allergy, nevertheless the evidence did not show it was negligent in failing to discover the harmful characteristics of the compound. Judge Hyde, in speaking for the court en banc said, 265 S.W.2d loc. cit. 731: *"The harmful characteristics of the chromium compound, herein involved, is not a matter of common knowledge and plaintiff had the burden of proof to show that in the exercise of due care defendant should have known it."* (Emphasis ours.) Defendant in that case also contended that in constructive notice an employer is not charged with notice of the knowledge of medical science but only with the knowledge of scientific facts possessed by men of general education. To this the court said, 265 S.W.2d loc. cit. 731–732: "Defendant * * * knew it was toxic to some extent. See 35 Am.Jur. 575, Sec. 144. We think the number and variety of industries, in which chrome has been used and ill effects from it observed,

shown by the evidence of both parties, has an important bearing on the issue of constructive or imputed knowledge; * * * It was at least a reasonable inference from the wide industrial experience with chrome that there was available information about it outside the medical profession, and it was shown that there were United States Government pamphlets on some phases of the subject as well as medical books." The court concluded that plaintiff's evidence was such that the issue of whether defendant knew or should have known of the harmful characteristics of chromium was properly for the jury. Cf. Gerkin v. Brown & Sehler Co., 177 Mich. 45, 60, 143 N.W. 48, 53, 48 L.R.A.,N.S., 224.

Plaintiff says there was evidence that the captan vapors were noxious in that she and her doctor say she was made ill upon their inhalation. However, her doctor's testimony taken in its most favorable light to her indicated only that she was probably sensitive to this odorizer, i. e., had an idiosyncrasy to it. He did not testify the odorizer was noxious. Nor did he testify it contained anything to which anyone other than plaintiff would be allergic. Nor can plaintiff's testimony that she became ill upon breathing its vapors be considered evidence sufficient to support a jury finding that it was noxious, especially in view of her own physician's testimony in her behalf, explaining her reaction to it as an idiosyncrasy. While it might have made her ill because she was sensitive to it, such proof of one person's sensitivity to it is not proof that it is a noxious product as that term is generally understood. See Williams v. Coca-Cola Bottling Co., Mo.App., 285 S.W.2d 53, 57; Stewart v. Martin, 353 Mo. 1, 181 S.W.2d 657. Otherwise, we would be in the impractical position of holding that such products as milk, butter, eggs, chocolate, cheese, corn, wheat, spinach, oranges, etc., are noxious. For it is well known that some people are sensitive or allergic to one or more of these things. Plaintiff also mentions certain testimony of defendant as tending

to show defendant knew this product could "get into * * * a suffocation point" and thus be noxious. Upon our examination of that testimony we do not believe it to be reasonably susceptible of that meaning, and therefore could not be the basis of a jury finding to that effect. Douglas v. National Life & Accident Ins. Co., 236 Mo. App. 467, 155 S.W.2d 267, 272; Bushman v. Barlow, 316 Mo. 916, 292 S.W. 1039, 1048-1049; Near v. St. Louis & S. F. R. Co., 261 Mo. 80, 168 S.W. 1186.

We conclude that taking the evidence in its most favorable light to plaintiff, and assuming for the purpose of this discussion that plaintiff was injured by inhaling captan vapors, the evidence fails to show (1) That the captan either in its component parts or as mixed consisted of anything that was poisonous, noxious or harmful to people who come into contact with it or its vapors; (2) Or that any person to defendant's knowledge had ever been made ill or otherwise injured by it; (3) Or that it was medically known there existed among the general public a class of people who were allergic to it. Since plaintiff has not adduced evidence in proof of any of these above enumerated situations it becomes unnecessary for us to pass upon the question of whether or not if supported by evidence they would give rise to the required duty of defendant to plaintiff in order to establish actionable negligence.[1]

Plaintiff has failed to adduce evidence from which it can be said that defendant owed to plaintiff a duty to use due care not to subject plaintiff to the vapors of captan by exposing it to the air and by spilling some of it while refilling its tank at its border station, for there is no evidence from which it can be said that in the exercise of due care this defendant could have foreseen consequences of an injurious nature.

Defendant unsuccessfully moved for a directed verdict in its favor at the close of all the evidence for want of proof making for submissibility. Defendant then requested certain instructions including D–5 instructing the jury in substance that it must find for defendant if they find that the vapor of captan was not toxic or poisonous, and if they find further that plaintiff possessed an idiosyncrasy or allergy to it, which caused her alleged injuries, and if they further find that defendant by the exercise of ordinary care could not have known that plaintiff was so sensitized or allergic to it. After verdict defendant moved to set aside the judgment entered upon the jury's verdict and to enter judgment in favor of defendant in accordance with its motion for a directed verdict. Plaintiff claims the giving of these instructions and particularly D–5 prevents defendant from now complaining of the insufficiency of the evidence to support an adverse verdict.

In moving for its directed verdict at the close of all the evidence, and renewing it after verdict for plaintiff, defendant was following a procedure recognized in our present code, Sections 510.280 and 510.290, RSMo 1949, V.A.M.S. When the motion for directed verdict is refused the court is deemed to have submitted the cause to the jury subject to a later determination of the legal questions so raised, if again presented after verdict and judgment, and to set aside the verdict and judgment and to enter judgment in accordance with the motion for a directed verdict. See, The Civil Code Act of 1943, Judge Hyde and Judge Douglas, Carr, Missouri Civil Procedure, Vol. 2, page 560; Girratono v. Kansas City Public Service

---

1. For a discussion of the possible duty of a manufacturer or combiner of manufactured elements to acquaint himself with the elements of his product and with established and accessible medical knowledge as to its effect upon those to be subjected to it, see 49 Michigan Law Review 963, "Liability of Manufacturer or Vendor to An Allergic Consumer"; Annotation, 26 A.L.R.2d 963. Cf. State ex rel. Jones Store Co. v Shain, 352 Mo. 630, 179 S.W.2d 19.

**12**

Co., Mo.App., 243 S.W.2d 539, transferred and reversed on other grounds 363 Mo. 359, 251 S.W.2d 59. See also, Nelson v. Kansas City, 360 Mo. 143, 227 S.W.2d 672. We hold that defendant did not waive its right to now complain of the insufficiency of the evidence to support an adverse verdict. In view of what we have already said which disposes of the case it is unnecessary to consider other contentions of the parties. We·have carefully examined plaintiff's cited authorities. They mainly concern cases involving natural gas, admittedly noxious and harmful, and not a gas odorizer. We find nothing in them inconsistent with our expressed views. In accordance with those expressed views this cause is reversed.

All concur.